**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Edward J. KACZMAREK, Defendant-Appellant.**

**No. 73-1426.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1973.

Decided Jan. 30, 1974.

George J. Cotsirilos, S. Jack Micheletto, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Thomas R. Mulroy, Jr., Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CLARK *, Associate Justice, and CUMMINGS and PELL, Circuit Judges.

PER CURIAM.

Appellant, Edward J. Kaczmarek, former Vice-President and Treasurer of Liberty Federal Savings and Loan Association, stands convicted of conspiracy to misapply and the misapplication of $244,250 of the funds of Liberty Federal in violation of Title 18, United States Code, §§ 371, 2 and 657.[1] The gist of the alleged conspiracy was that Kaczmarek participated in a check "kiting" scheme with a customer of Liberty Federal, Bernard Chemers.[2] As time went by, Kaczmarek demanded and received payments in cash for his services which were delivered indirectly to him from Chemers via an intermediary, John J. Viverito, the Credit and Collection Manager of Liberty Federal. Both Chemers and Viverito were charged in the indictment; both pleaded guilty and testified for the Government. Both were probated while Kaczmarek received a concurrent two-year sentence on two counts and a $10,000 fine.

Kaczmarek raises four questions: (1) insufficient evidence; (2) refusal of his "good faith" instruction; (3) the admission of the guilty pleas of Chemers and Viverito and the comment of the prosecutor thereon to the jury; and (4) an excessive sentence, imposed as punishment for exercising his right to a trial by jury. We find no merit in these contentions and affirm the judgment.

(1) For many years, Liberty Federal has engaged in the business practice of "check exchanges" whereby customers, upon authorization by a corporate officer, may exchange a personal check for a Liberty Federal check in the same amount in order to facilitate business transactions. It appears that prior to the circumstances giving rise to this prosecution, Liberty Federal provided

---

* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

1. 18 U.S.C. § 371 provides in pertinent part:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

18 U.S.C. § 2 provides:

"a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

18 U.S.C. § 657 provides in pertinent part:

"Whoever, being an officer, agent or employee of or connected in any capacity with . . . any . . . savings and loan corporation or association . . .

embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution or pledged or otherwise entrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both;"

2. The Government specified that under the scheme devised, Chemers would write personal checks in large amounts drawn on the Plaza bank. He would bring the checks to Liberty Federal and exchange them with the approval of Kaczmarek for Liberty Federal checks. Chemers then would proceed to a third bank, the Continental Bank, have the Liberty Federal checks certified and then have them deposited in his Plaza account for payment. The problem was that Chemers did not have sufficient funds in his Plaza account to cover his original personal checks. The Government asserted that the scheme allowed Chemers the use of Liberty Federal's money without authorization and without collateral and that Kaczmarek, in reckless disregard for the interests of Liberty Federal, violated his duty to make certain Chemers was solvent.

this service to Chemers, a real estate developer, with no apparent irregularity in the transactions. However on August 18, 1969, Kaczmarek approved the exchange of three of Chemers' personal checks, drawn on the Plaza Drive-In-Bank in the amounts of $49,925, $49,800 and $49,475. Chemers did not have sufficient funds to cover the checks he had written. Thereafter, this practice was continued for almost one month with check exchanges approved by Kaczmarek occurring as often as four times a week.

On September 19, 1969, when Edward J. Burns, then Vice-President and Secretary of Liberty Federal, discovered the frequency and size of the accommodation checks being issued, he directed Kaczmarek to stop exchanging so many checks in such large amounts to Chemers in a single day. Despite this admonition, however, on September 22, 1969, Kaczmarek approved five more of Chemers' checks totalling $244.250.[3] When Kaczmarek attempted to obtain Burns' authorization as to all five checks on September 24th, Burns refused and in conformity with the stated policy, approved only one check in the amount of $49,800. Shortly thereafter six Chemers checks, including the one authorized by Burns, were returned NSF (not sufficient funds). Upon return of the checks, a conference of Burns, Chemers and Kaczmarek concluded in the checks being placed in Kaczmarek's hands for collection. He directed that the checks be redeposited and they were again returned NSF. The Federal Reserve Bank prohibits the redeposit of any check which has been twice deposited and not been paid. After the second such deposit a legend is stamped on the check to prevent deposit a third time. Therefore, to escape this requirement and to be able to deposit the Chemers checks again, Kaczmarek periodically required replacement checks from Chemers, which were deposited. Upon return of these checks for insufficient funds, the routine would be systematically repeated. In October,

1969 Chemers enlisted the help of Viverito in getting the checks held up so that Chemers could have more time to pay. When Viverito contacted Kaczmarek, the latter agreed to hold up the checks upon payment of $1,000 by Chemers to him personally each month. Chemers began paying the $1,000 monthly bribe in November, 1969 and continued through August, 1970, using Viverito as a go-between.

One set of replacement checks totalling $294,050 were issued November 4, 1969 and were held until December 30th on Kaczmarek's instructions. They were listed on Liberty's monthly report to the Federal Home Loan Bank Board as "cash items" since they were carried as a "deposit memo" on the statement to Liberty Federal from the Continental Bank. This report was false, however, because the Chemers checks, though deposited for collection with Continental, were in truth "accounts receivable." By depositing these bad replacement checks on the 30th of December, they were not listed on Liberty Federal's December reconciliation report since they were an "in transit item." Thus the federal auditors were not aware of the checks; and the Board was kept in the dark. Kaczmarek as Treasurer was in charge of these transactions of Liberty Federal, and he effectuated their concealment. Again, on March 19, 1970 Kaczmarek gave the Liberty Federal accounting clerk two checks of Chemers, one for $20,000 and another for $9,700, which were held until May 7 on his direction.

In April 1970, Viverito, Chemers and Kaczmarek met in a restaurant and Chemers asked the latter if additional checks could be exchanged. Kaczmarek said that he would think about it. A few days later he advised it could be done if the checks were made out to Viverito, not to Liberty Federal. Viverito was to deposit them in his account at the Continental Bank and write checks on his account payable to Liberty Federal. Under this arrangement, there were

---

3. The check exchanges on September 22 constituted the substantive count in the indictment.

some fifteen check exchanges in amounts ranging from $500 to $12,000 between April and August, 1970. On May 4 a Chemers check for $10,000 payable to Viverito was approved by Kaczmarek. Viverito told Kaczmarek that his monthly payment of $1,000 was to come out of it. After cashing it, Viverito gave Kaczmarek the $1,000. Thereafter, in May, Viverito was called into Kaczmarek's office and was told that an audit by the Federal Home Loan Bank Board was imminent. Kaczmarek said that no further check exchanges would be possible and that all the currently held NSF checks would have to be deposited. Later that month Kaczmarek demanded $25,000 not to deposit them. Chemers told him $25,000 was "beyond reason." Finally, Kaczmarek relented and agreed to $12,000 to be paid by check from Chemers to Viverito and the latter's check to himself, which was exchanged at Liberty Federal, cashed on the spot and the money handed to Kaczmarek by Viverito at the cashier's window.

Late in June, 1970, Kaczmarek gave a Liberty Federal clerk two of Chemers' checks to hold, each being for $20,000. They were never deposited. In August, 1970, the Continental Bank called Burns and advised that Viverito was attempting to deposit a $35,000 Liberty Federal accommodation check which Burns discovered Viverito had approved himself. Burns stopped payment, reported the shortage to the Board of Directors and called for an audit. It was not until the audit of October, 1970, that the two undeposited checks, each for $20,000 were discovered.

■ We find this evidence amply sufficient to show specific intent on the part of Kaczmarek to defraud Liberty Federal and to support the jury's verdict of guilty on both counts in the indictment. As to the conspiracy, it is clear that it can exist without the formalities of an agreement, United States v. Varelli, 407 F.2d 735 (7 Cir. 1969), and that a conspiracy may be proved by circumstantial evidence and reasonable infer-

ences to be drawn by the jury from evidence of the parties' relationship, overt acts and the totality of their conduct. United States v. Cogwell, 486 F.2d 823 (7th Cir. 1973); Isaacs v. United States, 301 F.2d 706 (8th Cir. 1962). As to the substantive violation of the misapplication statute, the evidence strongly supports the jury's conclusion with respect to an unlawful intent to injure or defraud because of Kaczmarek's obvious reckless disregard for the interests of Liberty Federal. Mulloney v. United States, 79 F.2d 566 (1st Cir. 1935). Also see United States v. Hickey, 360 F.2d 127 (7th Cir. 1966); United States v. Stevison, 471 F.2d 143 (7th Cir. 1972).

■ (2) Kaczmarek requested the submission of "good faith" instructions in connection with the crime of misapplication of funds. The court refused to give them but did give an instruction on specific intent, advising the jury that the "government must prove that the defendant knowingly did an act which the law forbids, or knowingly failed to do an act which the law requires, purposely intending to violate the law." The instruction as to the word "wilfully" adequately covered a defense of good faith; and the overruling of Kaczmarek's request was not error. United States v. Grizaffi, 471 F.2d 69, 75 (7th Cir. 1972). Also see United States v. Emalfarb, 484 F.2d 787 (7th Cir. 1973) and United States v. Pritchard, 458 F.2d 1036 (7th Cir. 1972).

■ (3) Kaczmarek assigns error to the admission of guilty pleas of co-defendants. However, under the decided cases in this Circuit, we find none since an appropriate cautionary instruction was given to the jury. United States v. Kahn, 381 F.2d 824 (7th Cir. 1967); United States v. Aldridge, 484 F.2d 655 (7th Cir. 1973). We are obliged to follow these cases.

■ (4) Finally, Kaczmarek urges that his sentence was excessive and imposed as a penalty for standing trial. We find the sentence to be well within

the limits of the statute. Indeed, a ten-year sentence and $15,000 fine is the maximum, while Kaczmarek received concurrent sentences of two years on each count and a $10,000 fine. But Kaczmarek says that there is a disparity. We think not. Both of Kaczmarek's codefendants who pleaded guilty received the same sentence—probation. Kaczmarek, having elected to stand trial, subjected himself only to the risk of a judgment of conviction with appropriate statutory penalties attendant thereto. The authority of the District Court to impose any sentence within the statutory maximum is not subject to review except under "extraordinary circumstances." United States v. Humphreys, 457 F.2d 242 (7th Cir. 1972); Simpson v. United States, 342 F.2d 643 (7th Cir. 1965). Such circumstances are not present in this case; therefore we cannot say that the trial judge abused his discretion. Accordingly we find no merit in this claim.

Affirmed.