UNITED STATES of America,
Plaintiff-Appellee,

v.

Samuel G. REDWINE, Clifford G.
Redwine, and Chester Strong,
Defendants-Appellants.

Nos. 82–3048, 82–3055 and 82–3070.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1983.

Decided Aug. 17, 1983.

As Amended Oct. 13, 1983.

As Amended on Denial of Rehearings
Jan. 11, 1984.

Vance W. Curtis, Tipton, Ind., James Holland, Indianapolis, Ind., Kathryn De Neut Molewyk, Nashville, Ind., for defendants-appellants.

Walter W. Barnett, Dept. of Justice, Civ. Rights Div., Washington, D.C., for plaintiff-appellee.

Before WOOD and CUDAHY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Defendants challenge the sufficiency of the evidence supporting their convictions of conspiracy to intimidate a black family in connection with that family's occupation of a home in a white neighborhood in Muncie, Indiana; defendants also challenge the sufficiency of the evidence supporting their convictions of various substantive offenses,

---

* The Honorable Anthony J. Celebrezze, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

including the firebombing of and throwing of rocks at the family's home, and possession of an unregistered firearm. We affirm.

## I.

This sad tale of racial asperity begins on June 15, 1980, when Sammie and Hattie Williams, a black couple, and their four children moved into the all-white "Shedtown" neighborhood of Muncie, Indiana. Their home was located approximately a block and a half away from that of two of the defendants, Clifford and Samuel Redwine. The Williams family was the object of racially motivated harassment—including threats that their home would be burned, racial epithets, and the throwing of rocks and bottles against the house—from the moment they moved in until they abandoned their home when it was firebombed a month later. The government educed a variety of evidence, most of it circumstantial, that the defendants were prime movers in both the harassment and its incendiary culmination.

For example, one witness who lived next door to the Williams family testified that during the Williams' brief residency, she saw Samuel Redwine and others shouting racial epithets at the Williams' house at night. Another witness, also living next door, testified that in late June, 1980, he saw Chester Strong yelling similar epithets at the house, even as one of the Williams children was playing in the yard. Clifford Redwine, father of Samuel, rode by the Williams home nearly every day, circling the block and watching the house.

Defendants' conduct quickly escalated. A witness who lived across the street from the Williams home testified that she saw Samuel Redwine throw a rock through a window of the home at midnight on June 25, 1980. Another neighbor testified that, also in late June, she saw Samuel Redwine, accompanied by others, throwing rocks through a window of the house at about 10:00 p.m. In the course of investigating the June 25 incident, a Muncie police officer interviewed a woman who lived across the

street from Williams; the woman reported that she had seen Samuel Redwine throw a rock through the Williams' window that evening. However, when the officer next went to the Redwine house, Clifford Redwine, sitting on the front porch with his sons, Samuel and Jack, reported, "My boys have been here on the porch with me all evening."

The government also assembled a mosaic of evidence linking the defendants to the July 17, 1980 firebombing of the Williams' house. One witness, who "partied" with Chester Strong and Samuel Redwine throughout June, 1980, testified that on several occasions, Samuel Redwine stated that the black family "should be burned out" or "run out," and testified that Chester Strong stated similarly that the Williams family "shouldn't be there" and should be "burned out." Another witness testified that, two nights before the firebombing, he was asked by a member of a group which included Strong and Redwine whether he wished to participate in the burning of the Williams home. Chester Strong and Samuel Redwine were also part of a contingent which approached one witness the evening before the fire, and asked whether he wished to accompany them; at that time, either Samuel Redwine or Strong stated that "tonight was the night." The actual firebombing occurred at about 3:00 a.m. the following morning. Sammie Williams, awakened from his sleep, saw two bombs come through his window, explode, and then burst into flames; he fired his gun several times at a person visible near his back fence. One witness, who lived a block away from the Williams home and was sitting in his front yard at the time and heard the breaking of glass, testified that within two minutes of this noise, and before the fire became visible, he saw Samuel Redwine running down the street away from the direction of the Williams home. Other witnesses placed Clifford Redwine in front of the Williams home within three to five minutes of the firebombing and placed Chester Strong at the scene watching the fire.

Further evidence established links between the defendants and the firebombing. One witness, who had known Samuel Redwine for almost his entire life, testified that the day after the fire, she heard his voice from an alley behind Williams home, stating, "I done a good job on the house, didn't I?" Clifford Redwine's son-in-law testified that Samuel Redwine asked him, using obscene racial epithets, whether he had heard of the bombing. When the witness responded by suggesting that "you guys probably did it," Chester Strong did not refute this suggestion, but instead "was just laughing along with everybody else." This witness also testified that Clifford Redwine intervened in the discussion, instructing the others to "shut up . . . that it was an insurance job. . . ." In an interview with an agent of the Treasury Department's Alcohol, Tobacco and Firearms Division subsequent to the firebombing, Clifford Redwine, wearing a Ku Klux Klan insignia (one witness testified that Clifford Redwine had previously spoken of his membership in that organization), again protested that the conflagration was an "inside job," referring to Sammie Williams in obnoxious racist terms. Finally, numerous witnesses testified that Clifford Redwine appeared, with a gun on his hip, in the waiting room for witnesses called to testify before a state grand jury investigating the firebombing. Redwine urged the witnesses to go home and spoke to nearly every witness, asking them what they were doing there, inquiring rhetorically in one case, "Well you don't know nothing, so you can't say nothing, tell them nothing now, can you?" One witness, who was fifteen years old at the time, testified that these threats led him to give incomplete testimony.

In August, 1982, a federal grand jury issued a five count indictment in connection with these events. Count I charged Samuel Redwine, Chester Strong, Clifford Redwine and Jack Redwine with violating 18 U.S.C. § 241 by willfully conspiring together and with others between June 12, 1980 and July 17, 1980 to injure, oppress, threaten or intimidate the Williams family in the free exercise of their right to hold and occupy a dwelling without injury, intimidation or interference because of their race or color. The overt acts alleged in connection with the conspiracy included a discussion by all four defendants of the burning of the Williams' home; the throwing of rocks through the Williams' windows on June 25, 1980 by Samuel Redwine and Jack Redwine; and the firebombing of the Williams home on July 17, 1980 by Samuel Redwine and Chester Strong. Count II charged that Samuel and Jack Redwine violated 42 U.S.C. § 3631 by throwing rocks through the windows of the Williams' home on or about June 25, 1980 and thus, by force and the threat of force, willfully intimidated and interfered with the Williams family because of their race and color and because they occupied their home. Count III charged that all four defendants violated 42 U.S.C. § 3631 by throwing firebombs into the Williams' home on July 17, 1980, and thus willfully intimidated or interfered with the Williams family because of their race or color and because they occupied their home. Only Samuel Redwine and Chester Strong were alleged to have actually thrown the firebombs; Clifford and Jack Redwine were charged with aiding and abetting them in this endeavor. Count IV charged that Samuel Redwine, Jack Redwine and Chester Strong violated 26 U.S.C. § 5861(d) by knowingly possessing an unregistered firearm, a handmade firebomb. Count V charged the same defendants with making that weapon without government approval, in violation of 26 U.S.C. § 5861(f).

Jack Redwine's case was severed due to an uncompleted competency inquiry, and the remaining defendants waived their right to a jury. At the close of the government's evidence, the court granted Samuel Redwine's and Chester Strong's motion for judgment of acquittal on Count V of the indictment, but at the close of all the evidence, the defendants were convicted of the remaining counts as charged. Samuel Redwine was sentenced to five years of incarceration on the conspiracy count, one year on the firebombing count, one year on the rock-throwing count and five years on the

firearm possession count; the first two sentences were to run consecutively and the last two were to run concurrently with the first two. Clifford Redwine was sentenced consecutively to five years of incarceration on the conspiracy count and one year on the firebombing count. The court committed Chester Strong to the Attorney General for supervision under the Federal Youth Corrections Act. All three defendants appealed, urging reversal due to insufficiency of the evidence.

## II.

■ In examining the sufficiency of the evidence to sustain a conviction, we must review the evidence and all reasonable inferences which can be drawn from the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The appellant mounting an evidentiary sufficiency challenge bears a "heavy burden," *United States v. Garcia,* 562 F.2d 411, 414 (7th Cir.1977), and thus "[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Brandom v. United States,* 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971). Moreover, it is not for this court to reconsider questions of the weight of the evidence or credibility of witnesses, *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469.

We are also reminded that even where the government's case is, as here, primarily circumstantial, such evidence is "as pertinent as direct evidence to the establishment of guilt or innocence." *United States v. Cogwell,* 486 F.2d 823, 828 (7th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974). In a case hinging on circumstantial evidence, while it is important that we not permit a verdict based solely on the piling of inference upon inference, *Anderson v. United States,* 417 U.S.

211, 94 S.Ct. 2253, 41 L.Ed.2d 21 (1974), it is also imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court "must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference...." *United States v. Kwitek,* 467 F.2d 1222, 1226 (7th Cir.1972), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972). These observations are especially relevant to proof of conspiracy, the principal crime charged here. Because of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendant's participation can usually be established only by circumstantial evidence. *United States v. Washington,* 586 F.2d 1147, 1153 (7th Cir.1978); *United States v. Ford,* 324 F.2d 950, 952 (7th Cir.1963). We are satisfied that the evidence supporting defendants' conviction of both the conspiracy and the substantive crimes charged passes muster under these standards.

### A. The Conspiracy

■ The defendants were all convicted of violating 18 U.S.C. § 241 which makes it unlawful to "conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise and enjoyment of any right or privilege secured to him by the constitution or laws of the United States, or because of his having exercised the same ...." Defendants appear to argue that the evidence and all inferences favorable to the government drawn therefrom were insufficient to establish beyond a reasonable doubt that each of the defendants entered into an agreement, or that the purpose of the agreement was to injure, oppress, threaten or intimidate the Williams family because of their race, or that the agreement was directed at the victims' free exercise or enjoyment of their rights.[1] We note that while specific intent to interfere with a federally protected right must be shown, it is not necessary that the defendant be

---

1. Samuel Redwine suggests that the Williams' citizenship was not sufficiently proven, as their birth certificates were not produced. However, their direct testimony as to citizenship satisfies the proof requirement.

shown to have a legalistic appreciation of the federally protected nature of that right. *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). The evidence amply permits a finding beyond a reasonable doubt that a conspiracy existed to intimidate the Williams family in the exercise of their right to occupy their home, and that the defendants fully participated in that conspiracy.

The participation of Samuel Redwine in the unlawful conspiracy is abundantly established. Three eyewitnesses[2] testified that in late June, 1980, Samuel and Jack Redwine threw rocks at the Williams' windows at about the same time Samuel Redwine was heard to shout racial epithets at the home. The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof. *United States v. Kaczmarek,* 490 F.2d 1031, 1035 (7th Cir. 1974); *United States v. Cogwell,* 486 F.2d 823 (7th Cir.1973). It is impossible to reasonably infer from the joint actions of Samuel and Jack Redwine an intent other than to "injure, oppress, threaten, or intimidate" the Williams family as blacks in connection with their peaceful residency; such conduct amounts to a "concert of action" with specific intent evincing a conspiracy. *United States v. Cogwell,* 486 F.2d 823, 832 (7th

Cir.1973); *United States v. Zuideveld,* 316 F.2d 873, 878 (7th Cir.1963). But there is still more chilling evidence of the intimidatory object of the conspiracy and Samuel Redwine's sharing of that purpose: his statements prior to the firebombing that the Williams family should be "burned out" or "run out," his presence in a group which sought help in the bombing and one of whose members stated "tonight was the night," his hasty flight from the site of the firebombing[3] within two minutes of the event at 3:00 a.m., and subsequent boasting that he had "done a good job on the house, didn't I?" That Samuel Redwine acted concertedly and with racial intent to interfere with and intimidate the Williams' home occupancy through progressively more violent means could have been found beyond a reasonable doubt.

Similar circumstantial evidence links Chester Strong inextricably with the scheme of racially motivated harassment. Eyewitness testimony recalled Strong as yelling racial epithets in late June in front of the Williams house while one of the Williams children was playing outside. Strong not only stated to others that the Williams "shouldn't be there" and should be "burned out," but he also accompanied Samuel Redwine the night before the fire when Redwine stated, "tonight [is] the night," and he was present in a group that solicited participation in the burning of the Williams house. Finally, not only was

2. One of these witnesses, it is true, when asked later, "Did you see Sammie and Jack one night throw stones?" answered "No." However, it is unclear whether this is in fact an inconsistency, as she may have been simply denying that she saw *both* throw stones together; she had earlier testified only that she had seen Samuel throw stones. Even if this were an inconsistency, however, it would at most raise an issue of witness credibility, which is not for this court to assess on review. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

3. That the cause of the conflagration was a firebomb is established beyond a reasonable doubt by Sammie Williams' testimony concerning his observation of the entry of the bombs, the testimony of the Chief Inspector of the Muncie Fire Department, who investigated the

fire and concluded, on the basis of gasoline traces and glass recovered near the origin point of the fire, that the fire was caused by gasoline ignited and thrown through the window, and the defendants' planning, and *post hoc* vaunting of, the bombing. While there was other testimony from a forensic chemist who examined materials from the fire and was unable to identify an accelerant, and testimony that the Williams kept liquor in their house and that Mr. Williams had removed a gasoline can from his garage after the fire, the results of the Fire Department's on-site examination, Samuel Redwine's own admissions, Mr. Williams' vivid testimony as to the missile-borne nature of the fire, and the testimony of neighbors that they heard the sound of shattering glass immediately before the fire, overwhelmingly dispel any speculation that the fire occurred accidentally.

Strong present to observe the fire, but when confronted directly with the statement that he, along with others, "probably did it [i.e. the bombing]," Strong simply laughed. While each of these items, if taken alone, might not sufficiently prove Chester Strong's conspiratorial conduct, together they raise no real doubt that he adopted the specific aims of the harassment scheme as his own.

The strong circumstantial evidence here also suffices to eliminate any reasonable doubt as to Clifford Redwine's knowledge of, and participation in, the conspiracy. His first manifestation of agreement—his deliberate lie to the police concerning his sons' whereabouts on the evening of the June 25 rock-throwing incident—came after the conspiracy was already undoubtedly in existence, i.e., after his sons threw rocks through the Williams' window that evening with racial animus and an intent to harass. Once a conspiracy is established, it is possible for a defendant's participation to be proven from circumstances "substantial from their weight in position and context, though in abstraction they may seem only slight." *United States v. Harris,* 542 F.2d 1283, 1305 (7th Cir.1976). Thus, Clifford Redwine's giving of the false alibi, which had the effect of covering up and thus permitting the continuation of the conspiracy already in progress, acquires added weight when set against other evidence, e.g., his hostility to the presence of the Williams family in the neighborhood, his nearly daily surveillance of the Williams home, his presence on the scene minutes after the bombing itself in the early morning hours, and his adamant attempts to cover up the truth concerning the firebombing itself (including his pistol-wielding intimidation of grand jury witnesses, and his curt admonition to his sons not to talk about the bombing). Clifford Redwine was thus not only clearly aware of the ongoing course and consequences of the conspiracy initiated by his sons who lived with him, but he evinced his agreement with its aims and made quite demonstrative efforts to prevent discussion of it to outsiders and investigators. Hence, the hypothesis that he lied on the evening of the rock-throwing incident only to protect his sons and not to further the success of the underlying conspiracy is not only highly unlikely, but would, if true, not necessarily undermine the verdict in view of the strong cover-up evidence linking him directly to the firebombing portion of the conspiracy. *United States v. Freeman,* 498 F.2d 569, 576 (2d Cir.1974).

Clifford Redwine, and indeed all the defendants, object that here the conspiracy convictions depend upon the impermissible act of "piling inference upon inference," *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 21 (1974). We think, however, that the government's circumstantial evidence may be more accurately described as spokes pointing to one enterprise rather than as an attenuated linear chain of inference. Here there is separate and sufficient circumstantial evidence establishing each disputed element of the conspiracy—racial motivation, intent to interfere, and agreement (in Clifford's case, signalled by his specific objections to, and surveillance of, the Williams' presence, and his efforts to scotch investigation of both the rock-throwing incident and the bombing).

### B. *Rock-Throwing*

█ We also think the evidence is sufficient to permit a finding beyond a reasonable doubt that Samuel Redwine violated 42 U.S.C. § 3631 by throwing rocks through the windows of the Williams' house on or about July 25, 1980, thus willfully intimidating and interfering with the Williams family because of their race and occupation of the house. As noted in *II.A. supra,* three eyewitnesses stated that Samuel Redwine threw rocks through the house windows on or about that date; two of those witnesses identified the action as occurring on the precise evening charged. The defendant's racial motivation and intent to interfere is conclusively shown in his contemporaneous shouting of racial epithets at the Williams' house and his pronouncement that the Williams family should be "run out" or "burned out." It is not fatal to this count, as the defendant argues, that no direct evidence

was offered to prove that the Williams family was actually intimidated or interfered with; such interference or intimidation is to be inferred from violent acts or threats, and there is no need to show the subjective state of mind of the intended victim. *See United States v. Epps*, 438 F.2d 1192, 1193 (4th Cir.1971). In any case, the record discloses ample evidence that actual interference and intimidation occurred; as a result of the rock-throwing incident, Mr. Williams testified that he felt compelled to remove his children to his mother's house, had taken to sleeping in the living room, and felt it necessary to purchase a gun for his protection.

### C. The Firebombing

Similarly, there is sufficient evidence to permit the dispelling of any residual doubt that Samuel Redwine and Chester Strong firebombed the Williams' home in violation of 42 U.S.C. § 3631, and that Clifford Redwine aided and abetted them in doing so. The intent to interfere with the Williams' continued habitation of the dwelling is apparent from the face of the act, and the underlying racial motivation of the act is abundantly established by the evidence noted in *II.A. supra* that Samuel Redwine and Chester Strong shouted racial epithets at the Williams' home, and that Clifford Redwine similarly objected to the Williams' presence in the neighborhood on racial grounds. And also as noted in *II.A. supra,* the evidence permitted the conclusion beyond a reasonable doubt that Samuel Redwine and Chester Strong were directly involved in the bombing. Samuel Redwine stated several times that the Williams family should be "burned out;" he accompanied a group attempting to find others to assist in such a project; he, or Strong in his company, said the night before the fire that "tonight [is] the night;" he was observed less than two minutes after the explosion running from the scene; and he boasted of his success in the bombing the following day. Chester Strong had also urged that the Williams house be burned; accompanied Samuel Redwine on two occasions when the prospective house burning was discussed;

was present on the scene of the fire an hour after it began in the early morning hours; and he did not refute a direct accusation concerning his participation in the incident, but instead merely laughed. This pattern of evidence, taken as a whole, scarcely compels the entertainment of any innocent interpretation of these defendants' actions.

Clifford Redwine was charged only with aiding and abetting the firebombing, and we believe there is sufficient evidence that he "associate[d] himself with the venture, that he participate[d] in it as in something he wishes to bring about, [and] that he s[ought] by his actions to make it succeed." *United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980). As the defendant concedes in his brief, such participation in the firebombing is established if his participation in the conspiracy is shown, for it is settled that a proven conspirator is responsible for the substantive offenses based on the overt acts of his fellow conspirators as long as those acts were done in furtherance or as a natural consequence of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); *United States v. Shelton*, 669 F.2d 446, 455 (7th Cir.1982); *United States v. Sampol*, 636 F.2d 621, 675–76 (D.C.Cir. 1980). We are satisfied that Clifford Redwine was a conspirator, *see II.A. supra,* and it can hardly be said that the firebombing was not an act in furtherance of this violent and hate-filled conspiracy, especially as this specific act was contemplated by the conspirators substantially in advance of the commission of the act itself. Under the doctrine of vicarious conspiratorial liability, then, Clifford Redwine may be held liable for aiding and abetting the substantive firebombing offense.

### D. Possession of an Unregistered Firearm

The same evidence used to establish their responsibility for the firebombing, *see II. A & C supra,* is sufficient to prove beyond a reasonable doubt that Samuel Redwine and Chester Strong also violated 26 U.S.C. § 5861(d) by possessing an unregistered firearm, i.e., at least one of the

firebombs thrown into the Williams' home. The defendants protest that, while the government demonstrated that they registered no such weapons, it failed to directly demonstrate that they possessed such firearms. This contention is without merit, for under the statute, the possession requirement may be satisfied by circumstantial proof of the defendant's participation in the scheme which involved the placing and discharge of the firearm. *See United States v. Tweed,* 503 F.2d 1127, 1130–31 (7th Cir. 1974) (sufficient proof of possession in fact that residence in which bomb was placed was occupied by people whom defendant had threatened to kill a few hours earlier); *Langel v. United States,* 451 F.2d 957, 960 (8th Cir.1971).

For the foregoing reasons, we find the evidence sufficient to sustain defendants' convictions on Counts I–IV of the indictment.

AFFIRMED.