UNITED STATES of America,
Plaintiff–Appellee,

v.

Stephen HARTBARGER, Lonnie Hart-
barger, and Phillip W. Lafary, De-
fendants–Appellants.

Nos. 97–2324, 97–2387, 97–3851.

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1998.

Decided June 25, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied July 20, 1998.*

---

* Judge Ilana Diamond Rovner took no part in the consideration of the suggestion for rehearing en banc.

Judith A. Stewart, Office of the United States Attorney, Miriam R. Eisenstein (argued), Department of Justice, Civil Rights Division, Appellate Section, Indianapolis, IN, for Plaintiff–Appellee.

William E. MArsh (argued), Indiana Federal Community Defenders, Inc., Indianapolis, IN, for Stephen Hartbarger.

Bruce D. Brattain (argued), Brattain, Minnix & Young, Indianapolis, IN, for Lonnie R. Hartbarger.

Kevin McShane (argued), McShane & Gordon, Indianapolis, IN, for Phillip W. Lafary.

Before POSNER, Chief Judge, CUMMINGS and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

The government charged defendants Stephen Hartbarger, Lonnie Hartbarger, and Phillip Lafary with various crimes associated

with the burning of a cross on the property of an interracial couple and their children. Specifically, the indictment charged defendants with (1) conspiring to interfere or intimidate because of race with their victims' rights to occupy their home in violation of 18 U.S.C. § 241,[1] (2) interfering or intimidating because of race with their victims' rights to occupy their home in violation of 42 U.S.C. § 3631,[2] and (3) using fire to commit a felony in violation of 18 U.S.C. § 844(h)(1).[3] Before trial, defendants moved to dismiss the third count of the indictment, claiming that Congress did not intend 18 U.S.C. § 844(h)(1) to apply to the use of fire in the context of cross-burning. Defendants also moved in limine to exclude testimony regarding the victims' reactions to the cross-burning. The district court denied the motions. On February 24, 1997, a jury found defendants guilty on all counts. The Hartbargers received 66–month sentences and Lafary 84 months.

Defendants subsequently moved for a new trial. They claimed that (1) the district court abused its discretion in limiting the evidence they had been allowed to introduce regarding their childhood and upbringing which allegedly would have revealed that they did not understand the significance of cross-burning; and (2) the district court improperly allowed the jury to consider the reactions of the victims in determining the perpetrators' intent. Lafary filed an additional motion for a new trial, alleging that certain exculpatory evidence in the government's possession had not been turned over to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court denied the motions.

All three appealed and we consolidated the cases. On appeal, defendants raise the same arguments as they did in their motions for a new trial. Defendants also reiterate their objection to the application of 18 U.S.C. § 844(h)(1) to the use of fire in the context of cross-burning. We affirm the district court in all respects.

## I. Facts

In 1994, Stephen and Lonnie Hartbarger and Phillip Lafary lived in the Lake of the Lanterns Mobile Home Park in Indianapolis, Indiana. The Burton family lived there as well. Wilbur Burton is an African–American. His wife, Lisa Burton, is white. They have three children. Karen Hartbarger Downham, the sister of Stephen and Lonnie, often baby-sat for the Burtons.

The testimony at trial revealed the negative attitudes of Stephen, Lonnie, and Lafary toward African–Americans and mixed marriages. As for Lafary, Karen Hartbarger Downham testified that he often spoke of "niggers," that he believed the county was "white" and "niggers" belonged in Africa or perhaps should be shot, that he was upset that an interracial family resided in the trailer park, and that he had something "planned" for Lisa Burton, whom he called a "nigger-loving bitch," which would run them out of the park. She also testified that her brother Lonnie cautioned her not to baby-sit at the Burtons' because Lafary had plans to build a cross in their yard. Brian Dugger, a friend of Lafary, testified that Lafary did not like interracial couples and would refer to Lisa Burton as a "nigger lover" and the children as "porch monkey[s]," "half

---

1. 18 U.S.C. § 241 provides, in relevant part:

   If two or more persons conspire to injure, oppress, threaten, or intimidate any person * * * in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same * * * [t]hey shall be fined * * * or imprisoned not more than

2. 42 U.S.C. § 3631 provides, in relevant part:

   Whoever * * * by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with-
   (a) any person because of his race * * * and

because he is or has been * * * occupying * * * any dwelling * * * shall be fined under Title 18 or imprisoned not more than one year, or both; and * * * if such acts include the use, attempted use, or threatened use of * * * fire[,] shall be fined under Title 18 or imprisoned not more than ten years, or both[.]

3. 18 U.S.C. § 844(h)(1) provides, in relevant part:

   Whoever—(1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States * * * shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years.

breed[s]," and "jungle bunnies." Other witnesses testified similarly.

Witnesses testified that the Hartbarger brothers expressed the same sentiments. Lewis White testified that Stephen spoke of "niggers" and objected to the presence of an interracial couple in the trailer park. Once, when an African–American person parked in his way at a store, Stephen suggested that they burn a cross in his yard because that would "make him move out of the trailer park." At one time, Stephen had actually made a cross but subsequently dismantled it. White also remembered watching a movie with the Hartbargers at Lafary's house about a cross-burning and recalled that the message of the movie was "[i]f you wanted to scare the s—— t out of a black man, you would burn a cross in his front yard." Stephen testified that Lafary wanted to run the mixed couple out of the park and that when Lafary suggested burning a cross, he agreed. Witnesses also testified that Lonnie Hartbarger harbored similar racial animus, referring to blacks as "f——— niggers" and expressing that he did not want an interracial couple in his "surroundings."

On October 10, 1994, Stephen, Lonnie, and Lafary discussed burning a cross in front of the Burtons' trailer. Brian Dugger cautioned that cross-burning is not "cool" and that they could wind up in "serious trouble" as a result. Using Lafary's wood, the Hartbargers constructed the cross. Lafary told them there was a gas can in his shed that they could use to soak the cross, which they did, and then they stored the cross in Lafary's shed.

On the evening of October 12, 1994, the Hartbargers carried the cross from Lafary's trailer to the Burtons' house while Lafary drove in his truck. The Hartbargers then ignited the cross. Lisa Burton, who was home alone with the children, thought that the house was on fire and became hysterical. With neighbor Helen Schwartzel, Lisa Burton put out the fire and called her husband at his night job for him to come home.

Over objection, Lisa Burton testified that she and her husband were awake most of that night, discussing whether they should leave the trailer park and afraid of what might happen next. She believed the cross-burning to be a message that they should leave. Wilbur Burton testified that he considered the cross-burning to be equivalent to someone shooting into the house. He began leaving for work as late as possible and called home often, he bolted the doors and bottom windows and placed brighter lights outside, and he would not allow the children to play outside without supervision. The children slept in bed with Lisa Burton for some time after the incident.

After the cross-burning, Karen Hartbarger Downham confronted Lafary, asking "how he could have done something so cruel." He responded "So what if [I] did?" and indicated that this was not the only thing that would occur. Lafary also told Brian Dugger that when the cross was burned the children were "jumping up and down, screaming, hollering, and crying."

Months after the incident, the Hartbargers explained that they had chosen to burn a cross because Burton was black, and this was what you did when it came to getting the attention of a black person. Stephen testified that Lafary had told them that this was what one did to black people "like * * * in the old South" and that it would upset the Burtons. The Hartbargers alleged that they burned the cross, not because of Burton's race, but rather in retaliation for a confrontation that had occurred a few days earlier during which Wilbur Burton referred to them in racially derogatory terms. They claimed that they allegedly had almost hit one of the Burton children with their truck and that Wilbur Burton then called them racially derogatory names such as "corn-fed honky." However, no one was able to corroborate the story.[4]

---

4. Wilbur Burton testified that no such confrontation occurred. Brian Dugger testified that he heard the Hartbargers and Lafary discussing such an incident. Helen Schwartzel testified that earlier in the summer Eric Burton was almost hit by a truck but that she was the one who yelled at the driver. Another witness, who claimed to be in the truck at the time, testified that a woman with dark hair yelled at them to slow down.

## II. Analysis

### A. Whether the district court abused its discretion in limiting the evidence the defendants were allowed to introduce regarding their childhood and upbringing

During trial, the district court ruled to limit the evidence of the Hartbargers' early childhood and education to testimony by one sibling and to events occurring after each of the Hartbargers was fourteen years old.

We review a district court's evidentiary ruling for an abuse of discretion. United States v. Allison, 120 F.3d 71, 74 (7th Cir. 1997), certiorari denied, —— U.S. ——, 118 S.Ct. 455, 139 L.Ed.2d 389 (1997). The Hartbarger defendants contend that the district court abused its discretion in limiting the evidence they were allowed to introduce regarding their unfortunate childhood and upbringing because such evidence would have revealed that they did not understand the significance of cross-burning and therefore did not have the requisite intent to commit the crimes for which they were eventually convicted. Specifically, they sought to introduce testimony that they were raised in an isolated environment, with no interaction with persons besides certain family members, no meaningful education, and no exposure to television or radio and basically no exposure to media such as newspapers and magazines. Stephen points out that he did not leave the family farm until he was sixteen years old, when he was removed by the county welfare department.

While recognizing that the Hartbargers' early home life was relevant to their understanding of their intent in burning the cross, the district court determined that allowing an unlimited amount of evidence regarding their childhood was not probative of their state of mind when they burned the cross in the Burtons' yard, at which time Stephen was twenty-four years old and Lonnie was eighteen years old.

We hold that the district court's decision to limit the evidence of the Hartbargers' upbringing (1) to the time beginning when they were fourteen years old and (2) to testimony by only one sibling was not an abuse of discretion based on the low probative value and highly prejudicial nature of the evidence. In addition, the district court's ruling still allowed the Hartbargers to introduce a significant amount of testimony which showed that they were raised in unusually isolated and educationally limited circumstances. Moreover, evidence was introduced which indicated that they harbored racial animus and, contrary to their contention, were quite aware of the significance of cross-burning when they burned the cross in the Burtons' yard.

The Hartbargers' understanding of their actions at the time they burned the cross and their awareness of the symbolism of burning a cross are relevant to whether they had the specific intent to intimidate or interfere with their victims' right to occupy their home. However, this does not mean that an exploration of their entire childhood was necessary to determine their awareness. As the district court noted, "the probative value of the Hartbargers' upbringing diminishes the greater the distance in time away from the time of the cross burning. In other words, whether the Hartbarger defendants were isolated from the world as twenty-year olds would be far more relevant to what they might have known at the time of the events in this case * * * than whether they were locked in their rooms as six-year olds." The Hartbargers had been out of their original home environment and had been living, working and educated in society for some time (seven years for Stephen and three years for Lonnie) and were no longer children when they committed the offense. Thus the district court correctly concluded that "a comprehensive exploration of the boys' childhood and adolescence was not probative of their awareness at the time of the events in question" and appropriately limited the evidence of the Hartbargers' early education and upbringing to the testimony of one sibling regarding events occurring after they each were fourteen years old.

The district court's ruling was proper because evidence exploring the Hartbargers' entire childhood also would have been prejudicial. While the Hartbargers' upbringing

was most unfortunate, evidence of the deplorable conditions in which they were raised would likely have evoked an emotional reaction from the jury. Balancing the prejudicial nature of the evidence of the Hartbargers' early childhood with its low probative value, the district court correctly limited the evidence of their upbringing.

In addition, despite its ruling, the district court admitted a substantial amount of testimony regarding the upbringing of the Hartbargers prior to the age of fourteen which described the defendants' unfortunate childhood. Specifically, the court admitted the testimony of Karen Hartbarger Downham revealing that she and her brothers were raised on a farm isolated from the world and from one another and the testimony of Stephen Hartbarger establishing that they were educated at home based on a Christian mail order outfit. Defendants have not shown any reason why more testimony regarding their childhood was necessary.[5]

Finally, even though the defendants were raised in an isolated environment, the record demonstrates that by the time they burned the cross, the Hartbargers had developed racial animus as seen by their displeasure with an interracial couple living in the trailer park and were quite aware of the significance of cross-burning. Testimony revealed that the Hartbarger defendants understood that cross-burning was done to frighten an African-American person. In fact, Stephen once had suggested that they burn a cross in the yard of an African–American who parked his car in their way at a store because that would "make him move out of the trailer park." Lewis White testified that he remembered watching a movie with the Hartbargers at Lafary's house about a cross-burning and recalled that the message of the movie was "[i]f you wanted to scare the s— t out of a black man, you would burn a cross in his front yard." And months after the incident, the Hartbargers explained that they had chosen to burn a cross because Burton was black, and that was what one did to get the

attention of a black person. Therefore, based on the evidence, a jury could conclude that the Hartbargers conspired to interfere with and intimidate the victims based on their race; additional evidence regarding the defendants' upbringing would not have changed this result.

**B. Whether the district court abused its discretion in admitting evidence regarding the impact of the cross-burning on the victims and whether the district court erred as a matter of law in instructing the jury that it could consider the victims' reactions to the cross-burning in determining the intent of the perpetrators**

▌ Over defendants' objection, the district court admitted testimony from the victims and witnesses showing the impact of the cross-burning on the Burtons, specifically that they were frightened and upset. The court then instructed the jury that

> While a victim's reaction to a cross burning is not conclusive evidence of the defendant's intent, it may be considered nonetheless as some evidence of his intent.

Defendants contend that the district court abused its discretion in admitting evidence regarding the impact of the cross-burning on the victims and erred as a matter of law in instructing the jury that it could consider the victims' reactions to the cross-burning in determining the intent of the perpetrators. We disagree.

▌ In cases involving threats, courts have held that victim impact evidence is relevant to determine whether defendants used, or attempted to use, force or threat of force to intimidate or interfere with the rights of their victims. As this Court has stated, to prove that a true threat was made, the government must establish that the statement was made " 'in a context or under such circumstances wherein a reasonable person would foresee that the statement would be

---

**5.** In moving for a new trial, defendants also contended that Blackford County Welfare Department caseworker Linda Miller was not permitted to testify. Not only did defendants waive this issue by not raising it at trial, because the district court's limitation was placed only on the number of Hartbarger siblings permitted to testify about the conditions in the Hartbarger home, the limitation, in any event, would not have applied to Ms. Miller.

interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon or to take the life of [another individual].'" *United States v. Khorrami*, 895 F.2d 1186, 1190 (7th Cir.1990), *certiorari denied*, 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (quoting *Roy v. United States*, 416 F.2d 874, 877 (9th Cir.1969)) (additional citation omitted); see also *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (stating that a threat must be evaluated in context, including the reaction of the listeners). In *United States v. J.H.H.*, 22 F.3d 821 (8th Cir.1994), the Eighth Circuit held that "[e]vidence showing the reaction of the victim of a threat is admissible as proof that a threat was made," and thus the court concluded that evidence of an African–American family's subjective reactions to cross-burnings was relevant in determining whether defendants intended to threaten the family or to cause reasonable fear of the imminent use of force. *Id.* at 827. In evaluating the evidence of the recipients' reaction to the alleged threats, the court asked whether an objectively reasonable recipient would view the message as a threat and thus rejected the defendants' claim that the reactions to the cross-burnings were inadmissible.

The court in *United States v. Fulmer*, 108 F.3d 1486 (1st Cir.1997), also held that testimony regarding a victim's reaction to a threat was admissible. The court reasoned that "evidence of the recipient's reactions to the alleged threat [is] relevant to the determination of whether the statement is a 'true threat.'" *Id.* at 1499. This is so because "[t]he actual recipient's reaction to the statement shows that the recipient did perceive the message as a threat. This reaction is probative of whether one who makes such a statement might reasonably foresee that such a statement would be taken as a threat." *Id.* at 1500; see also *United States v. Schneider*, 910 F.2d 1569, 1571 (7th Cir. 1990) ("The fact that the victim acts as if he believed the threat is evidence that he did believe it, and the fact that he believed it is evidence that it could reasonably be believed and therefore that it is a threat. By this chain of inference, the relevance of the [recipient's] testimony is established."). The

court noted that even when determining a "true threat" from the perspective of the individual making the statement, "we have found that evidence of the effect of the threat upon its listener is relevant to what a reasonable person in the position of the speaker should have foreseen. Therefore, although the proper standard is what a person making the statement should have reasonably foreseen, we find that evidence of the recipient's reactions is relevant to that inquiry." 108 F.3d at 1500. After determining that such evidence was relevant, the court concluded that "[o]n the other side of the equation, any prejudice, let alone unfair prejudice, did not substantially outweigh the probative value of much of the proffered evidence." *Id.*

In support of their argument that evidence regarding the impact of the cross-burning on the victims was irrelevant, defendants rely on *United States v. Hayward*, 6 F.3d 1241 (7th Cir.1993), *certiorari denied*, 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994). However, in Hayward we did not hold that victim impact evidence is never relevant to determine intent. In fact, we admitted testimony that "[Pam] Rayan and her children saw the cross and were frightened." *Id.* at 1244. Rather, we held that the government was not required to show that the victims moved from their house as a result of the cross-burnings in order to prove the defendants intended to intimidate and interfere with their housing rights, and thus evidence regarding the victims' pending eviction proceedings was irrelevant. *Id.* at 1253.

In rejecting defendants' argument that such evidence was relevant to demonstrate that the occupants left the house after the cross-burnings because they were evicted rather than intimidated, we reasoned that "[w]ithout doubt, the evidence at trial showed that the defendants burned the crosses to intimidate the tenants and to interfere with their right to associate freely in their home with people of another race." *Id.* at 1252. The defendants had stated that they disliked the idea of black people coming into their town and had solicited participation in a cross-burning because "there was a nigger living with a white bitch * * * ." *Id.* Because the evidence showed that the defendants had

the specific intent to intimidate the victims and interfere with their right to associate freely in their home, we did not allow defendants to introduce testimony demonstrating that the victims were not actually intimidated in order to vitiate our finding of specific intent. We reasoned that in a case where the evidence established that the defendants intended to intimidate the victims, evidence that indicated that the victims were not actually intimidated was not relevant because in such a situation "[e]vidence of the victims' state of mind would tell us little, if anything, about the defendants' state of mind in burning the crosses." *Id.* Because the evidence regarding the pending eviction proceedings did not shed light on defendants' intent, which was already established through other evidence, the testimony was irrelevant.

■ The situation in *Hayward* is distinguishable from the facts of this case. As in *Hayward*, the evidence here showed that the defendants intended to intimidate the victims. Testimony revealed that Lafary was upset that an interracial family resided in the trailer park and that he had something "planned" for Lisa Burton which would run them out of the park. Evidence also showed that the Hartbargers objected to the presence of an interracial couple in the trailer park. In fact, Stephen had once suggested that they burn a cross in an African-American person's yard after he parked in their way at a store because that would "make him move out of the trailer park." After the incident, the Hartbargers explained that they had chosen to burn a cross because Burton was black, and that was the weapon of choice when it came to getting the attention of a black person.[6] However, unlike the testimony excluded in *Hayward*, the testimony of the victims was not introduced here in an

attempt to show that although the evidence established that the defendants burned the crosses with an intent to intimidate, the victims were not subjectively intimidated; rather the victim testimony here corroborated that they were in fact intimidated. While the evidence regarding the victims' pending eviction proceedings in *Hayward* would have contradicted the finding that the defendants intended to intimidate and interfere with the victims and thus was irrelevant, the evidence here confirmed that the defendants intended to intimidate and interfere.

In this respect, this case is similar to *United States v. Redwine*, 715 F.2d 315 (7th Cir.1983), *certiorari denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). In *Redwine*, we noted that it is not necessary to show the subjective state of mind of the intended victim because interference or intimidation can be inferred from violent acts or threats, and found that the defendants' shouting racial epithets and objecting to the victims' presence in the neighborhood on racial grounds established the defendants' racial motivation and intent to interfere. *Id.* at 322. However, while it was not essential to show that the victims were actually intimidated, we reasoned that such evidence was not irrelevant, emphasizing that "[i]n any case, the record discloses ample evidence that actual interference and intimidation occurred; as a result of the rock-throwing incident, Mr. Williams testified that he felt compelled to remove his children to his mother's house, had taken to sleeping in the living room, and felt it necessary to purchase a gun for his protection." *Id.*

■ Based on the above reasons, the evidence regarding the victims' reaction was relevant to the issue of whether the defendants intended to threaten the Burtons by burning a cross, and therefore the court did not err in instructing the jury that

> While a victim's reaction to a cross burning is not conclusive evidence of the defen-

---

**6.** In addition, the district court correctly instructed the jury that defendants could be found guilty even if they had mixed motives in committing the act. Even if the jury believed that defendants were retaliating against Burton because of the alleged confrontation, having more than one mo-

tive does not change the fact that they had the specific intent to use a racially charged symbol to frighten and intimidate the Burtons and to interfere with their enjoyment of their right to fair housing.

dant's intent, it may be considered nonetheless as some evidence of his intent.[7]

## C. Whether the district court erred as a matter of law in interpreting 18 U.S.C. § 844(h)(1) as applicable to cross-burnings

■ Defendants argue that the district court erred as a matter of law in interpreting 18 U.S.C. § 844(h)(1) as applicable to cross-burnings. However, in *Hayward*, this Court held that § 844(h)(1) applies "to anyone who uses fire to commit any felony" and thus unambiguously applies to cross-burnings 6 F.3d at 1246–1247. We decline defendants' request to reconsider this well-reasoned decision.

Section 844(h)(1) punishes the use of fire or an explosive to commit any federal felony. Specifically, § 844(h)(1) provides that

Whoever * * * uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, * * * including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device, shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for five years [to run consecutively to the punishment received for the predicate felony] but not more than 15 years * * *.

The defendants in *Hayward* maintained that Congress intended § 844(h)(1) to apply only to arson cases and not to the use of fire in the context of cross-burning. However, we relied on the plain language of the statute which does not limit itself to the prosecution of arson cases and concluded that § 844(h)(1) applies "to anyone who uses fire to commit any felony." *Id.* at 1247. Therefore, we held that § 844(h)(1) applied to defendants who used fire to burn two crosses in order to

commit the felony of violating the civil rights of the occupants of the house under 18 U.S.C. § 241. *Id.* at 1246.

We rejected the reasoning of the Eighth Circuit which relied on an analysis of the legislative history in concluding that § 844(h)(1) is limited to arson cases and does not apply to cross-burnings *Id.* at 1248; see *United States v. Lee*, 935 F.2d 952 (8th Cir. 1991), *certiorari denied*, 511 U.S. 1035, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994). We criticized the Eighth Circuit's methodology in looking first to the legislative history instead of to the language of the statute to assess congressional intent as "put[ting] the cart before the horse." 6 F.3d at 1248. Because the language of the statute was clear and unambiguous, we held that § 844(h)(1)'s mandatory five-year prison term for anyone who has been convicted of using fire or an explosive to commit any felony applies to the felony of conspiracy to deny civil rights by means of a cross-burning under 18 U.S.C. § 241. Id.

Based on *Hayward*, we reject defendants' argument that Congress added the word "fire" to the subsections of § 844 merely to ensure jurisdiction over arsons not caused by explosive devices. We also reject defendants' argument that by amending 42 U.S.C. § 3631 to provide an enhanced penalty when fire is used, Congress intended to have that statute and not § 844 applied in cases involving cross-burnings. The legislative history of the amendment of § 3631 should not "be construed to limit in any way a defendant's criminal liability under * * * any other Federal criminal statute." S.Rep. No. 149, 103d Cong., 1st Sess. (1993). Thus Congress did not intend the amendment to § 3631 to serve as a substitute for application of § 844(h)(1) where there has been a conspiracy to deny civil rights by means of a cross-burning under 18 U.S.C. § 241.[8] We hold that the

---

7. In addition, we note that the defendants' failure to object to the reformulation of the instructions constitutes a waiver. The government had objected to the defendants' proposed instruction, and the district court accepted the government's position and reformulated the instruction. Aside from the merits, because defendants did not object to the reformulation, they have waived this argument. Fed.R.Civ. P. 51. Finally, even if it had been error to admit the victims' reaction,

such error would have been harmless in light of the substantial evidence of the defendants' intent to interfere and intimidate that existed apart from the reaction of the victims.

8. Because 18 U.S.C. § 241 serves as the predicate felony for application of § 844(h)(1), we do not need to address whether 42 U.S.C. § 3631 can be a predicate felony for application of § 844(h)(1).

district court properly concluded that 18 U.S.C. § 844(h)(1)'s sentencing enhancement for using fire to commit any federal felony applies to cross-burnings in violation of 18 U.S.C. § 241.

## D. Whether the district court abused its discretion in denying Lafary a new trial

■ The district court denied Lafary's motion for a new trial based on the allegation that certain exculpatory evidence in the government's possession was not turned over to the defense despite a request for such information in violation of the government's obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Lafary alleged that after the trial, witness Brian Dugger disclosed that the government had threatened to prosecute him for the same crime if he continued to refuse to testify under the Fifth Amendment. Dugger also allegedly claimed that he was paid more than the standard witness fee to testify and was promised help with some local pending felony charges in exchange for his testimony. Lafary argued that because this information would have been useful to impeach Dugger's testimony, it should have been turned over by the government as newly discovered exculpatory evidence. Lafary's theory was that such evidence would have impeached the following statements made by Dugger: (1) Dugger's warning to the defendants that cross-burning was a serious crime and was not "cool;" and (2) Dugger's testimony that Lafary disclosed to him that the Burton children were jumping up and down and crying when they saw the burning cross. By impeaching these statements, the argument goes, Lafary might have been viewed as a bystander rather than a coconspirator in the crime.

■ A district court's decision to deny a new trial is reviewed for an abuse of discretion. *United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir.1996), *certiorari denied*, —— U.S. ——, 118 S.Ct. 582, 139 L.Ed.2d 420 (1997). To be entitled to a new trial as a result of a *Brady* violation, a defendant must establish that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material to an issue at trial. Evidence is material only if there is a "reasonable probability" that the disclosure of the allegedly suppressed evidence would have changed the result of the trial. *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995). Such a reasonable probability exists if the suppression of evidence undermines confidence in the outcome of the trial. *Id.* at 670.

The district court was correct in denying Lafary a new trial because there was no reasonable probability that use of the allegedly withheld evidence would have changed the verdict. While Lafary claimed that such information was necessary to impeach Dugger, the information disclosed after trial would have done little or nothing to impeach Dugger's testimony. At most, such testimony would have established that Dugger found it better off to testify than refuse to do so. For example, Lafary alleged that the government informed Dugger that while he was not a suspect, his status could change. Not only was it was permissible for the government to inform a potential witness of this, but the jury also was already aware that Dugger's name had been reported to the police as a potential suspect based on Karen Hartbarger Downham's testimony and thus were free to infer that this may have given Dugger the incentive to testify against the defendants. Lafary also alleged that Dugger was bribed to testify by being paid more than his normal witness fee. However, the district court noted that the alleged overpayment to Dugger consisted only of cab fare in addition to his regular witness fee which, as a matter of law, is not overpayment. Finally, Lafary's allegation that the government's failure to disclose that an FBI agent made an offer "to put in a good word" for Dugger regarding other felony charges pending against him if he testified was of little value as impeachment because even if it gave him the incentive to testify, it does not lead to the conclusion that he testified falsely.

Even if the evidence would have impeached Dugger, casting doubt on Dugger's credibility would not have benefitted Lafary in any event. Specifically, regarding Dug-

ger's testimony that Lafary harbored racial animus, such testimony was cumulative of the testimony of other witnesses and thus impeaching Dugger with respect to Lafary's racial attitudes would not have changed the result at trial. As for Dugger's comments about the seriousness of cross-burning, while such evidence was damaging to the Hartbargers because they were the ones who denied understanding the meaning of cross-burning, such testimony again was merely cumulative with respect to the case against Lafary. As for Dugger's testimony regarding the Burton children's reaction to the cross-burning, such testimony was not necessary to connect Lafary to the conspiracy because the court had sufficient testimony by others, such as Karen Hartbarger Downham and Stephen Hartbarger, which linked him to the conspiracy to burn the cross. While Lafary claimed that Dugger's testimony describing the children crying and jumping up and down was the only testimony to establish his presence at the scene of the crime, presence at the scene of the cross-burning is neither sufficient nor necessary to convict someone of conspiracy and, in any event, Dugger's testimony did not necessarily place Lafary at the scene.[9]

The district court properly held that there was no "reasonable probability" that disclosure of the allegedly withheld information would have changed the result of the trial based on the marginal use of such information and the substantial evidence of Lafary's guilt independent of Dugger's testimony and thus did not abuse its discretion in denying Lafary a new trial.

### III. Conclusion

Based on the foregoing, we hold that the district court did not abuse its discretion in limiting the evidence the Hartbargers were allowed to introduce regarding their childhood and upbringing to one sibling and to events occurring after each of the Hartbargers was fourteen years old. The district court likewise did not abuse its discretion in admitting evidence regarding the impact of the cross-burning on the victims and did not

err in instructing the jury that it could consider the victims' reactions to the cross-burning in determining the intent of the perpetrators. Based on this Court's well-reasoned decision in Hayward, the district court did not err as a matter of law in interpreting 18 U.S.C. § 844(h)(1) as applicable to cross-burnings. Finally, the district court properly denied Lafary's motion for a new trial, alleging that certain exculpatory evidence in the government's possession had not been turned over to the defense in violation of *Brady v. Maryland*. We AFFIRM the district court's decision in all respects.

---

9. Dugger merely testified that Lafary told him that the Burton children were jumping around and crying when the cross was burned. Dugger testified that Lafary never revealed how he knew that this was the reaction of the children and noted that Lafary could have obtained this information from another person rather than witnessing it himself.