**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Richard GUZZINO and Robert Ciarrocchi, Defendants-Appellants.**

**Nos. 85–2413, 85–3099.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1986.
Decided Jan. 27, 1987.

Gerald M. Werksman, Chicago, Ill., for defendants-appellants.

Robert J. Erickson, Asst. U.S. Atty. (Anton Valukas, U.S. Atty.), Chicago, Ill., for plaintiff-appellee.

Before WOOD and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Were this attempted murder case not so serious, a recitation of some of its facts might suggest a Marx Brothers skit instead of a relationship to organized crime.

On April 11, 1984, defendants Richard Guzzino and Robert Ciarrocchi were charged with conspiracy to deprive a United States citizen of his right to provide information and testify as a witness in a judicial proceeding, in violation of 18 U.S.C. § 241 (1982) (Count I),[1] obstruction of justice, in violation of 18 U.S.C. § 1503 (1982) (Count II),[2] and use of a firearm in the commission of a felony, in violation of 18 U.S.C. § 924(c)(1) (1982) (Count III).[3]

After a jury trial defendants Guzzino[4] and Ciarrocchi were convicted of all three counts.[5]

1. 18 U.S.C. § 241 (1982) provides:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or
>
> If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—
>
> They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

2. 18 U.S.C. § 1503 (1982), with minor amendments since the time of the alleged offenses, provides:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 924(c)(1) (1982) provided in relevant part at the time of the alleged offenses:

> (c) Whoever—
>
> (1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States, or
>
> (2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States,
>
> shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years....

4. Additionally Guzzino was charged in Count IV with unlawful receipt of a firearm by a previously convicted felon in violation of 18 U.S.C. § 922(h)(1) (1982), but this charge was dismissed before trial upon the government's motion.

5. Guzzino was sentenced to consecutive terms of seven and one-half years imprisonment on Counts I and III; sentence on Count II was suspended in favor of five years probation. Appellant Ciarrocchi was sentenced to a maximum aggregate term of 25 years imprisonment and committed for evaluation pursuant to 18 U.S.C. § 4205(c) (1982) (repealed effective Nov. 1,

On appeal defendants argue three issues: (1) whether the evidence was sufficient to establish that this bungled murder attempt involved federal crimes; (2) whether the evidence was sufficient to show defendants' knowledge and intent to commit the charged crimes, and (3) whether certain evidentiary trial rulings were erroneous. We affirm.

## I. FACTUAL BACKGROUND

This is the story of a "mob"-related but unsuccessful conspiracy to kill Alfred Pilotto. Participants in the conspiracy included the two defendants and also Sam Guzzino, now deceased brother of defendant Richard Guzzino, and Daniel Bounds. Sam Guzzino, who died prior to the return of the indictment, and Bounds were named as coconspirators but not as defendants. Bounds testified as the government's principal witness.

Pilotto, a high-ranking official of the Laborers' International Union, was indicted June 3, 1981, in the Southern District of Florida along with Anthony Accardo, the reputed head of the Chicago organized crime family, and fourteen other defendants. All were charged with conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity (RICO), specifically, for receiving a two million dollar kickback from union insurance programs, in violation of 18 U.S.C. § 1962(d) (1976). *See United States v. Accardo*, No. 81–230–CR–ALH (S.D.Fla. June 3, 1981).[6] The *Accardo* defendants were arraigned on June 19, 1981, pleaded "not guilty," and the court set trial for Monday, July 27, 1981. The facts of the present case, set primarily in Chicago, Illinois, intervene in the *Accardo* case time sequence. On July 25, 1981, two days before the date set for trial, Bounds, aided by coconspirators Sam Guzzino, Richard Guzzino and Ciarrocchi, shot and wounded, but did not succeed in killing Pilotto.

This intervening Illinois factual situation demonstrates that in some circles golfing is very serious business. It appears that you cannot always trust the other members of your foursome, not just because they may fudge a little on their scores, but because one of them may have you murdered before the game is over.

This story, strenuously attacked by defendants, was revealed to the jury largely through the testimony of unindicted coconspirator Daniel Bounds. The defendants, Richard Guzzino and Robert Ciarrocchi, did not actually pull the trigger on the eighth tee at the Lincolnshire Country Club in Will County, Illinois, but they were important accessories. Sam Guzzino "masterminded" the murder effort. Sam Guzzino was the brother of Richard Guzzino and the former father-in-law of Bounds, a cab driver, whom he hired to murder Alfred Pilotto. Prior to these events, Bounds had been married to Sam Guzzino's daughter and fathered a child, who after the Boundses' divorce was in the custody of the mother.

On July 17, 1981, Sam Guzzino and Bounds were alone when Sam advised Bounds he had a job for him—murder. Bounds reluctantly accepted the assignment, induced by Sam's assurances that he would make it easier for Bounds to visit Bounds's daughter, and that, in addition, there would be certain financial benefits. Sam also promised a down payment of $2,000, plus a weekly stipend and a job at

---

1987). At the completion of the evaluation, Ciarrocchi's sentence was reduced to consecutive terms of six years imprisonment on Count I and four years imprisonment on Count III, subject to the early release provisions of 18 U.S.C. § 4205(b)(2) (1982) (repealed effective Nov. 1, 1987); his sentence on Count II was suspended in favor of five years probation.

**6.** The cases of five of the sixteen defendants were severed before trial. One of those defendants, Trafficante, has not yet been tried because of his serious illness, but he will be tried separately. Four defendants filed interlocutory appeals. Their appeals failed and they were ordered to stand trial. A mistrial was declared and a new trial ordered on their case on November 19, 1986.

Of the other eleven defendants, three, including Accardo, were acquitted. The remaining eight, including Pilotto, were sentenced September 14, 1982, and their convictions were affirmed in *United States v. Caporale*, 806 F.2d 1487 (11th Cir.1986).

one of his several businesses. Bounds's decision to accept this assignment may have been slightly influenced by Sam's pointed reference to the way these matters are customarily handled if, after a friendly discussion of the job, the recruit hesitates. Sam explained the remedy for hesitation. "Now [that] you know about the hit coming down," he said, "I can't guarantee how long you're going to live." Sam also admitted that he personally stood to gain "millions" from it. The hit was to be accomplished "soon," but Sam declined to identify the victim because, as he explained, "the least [Bounds] kn[e]w about it . . . the better off [he was]."

The following morning Bounds, Sam Guzzino, and defendant Richard Guzzino met at Sam's cab company where Bounds was employed. Defendant Guzzino mentioned that he had heard Bounds had been picked for the job and expressed his confidence in Bounds, adding that he himself was "too fat" to handle it although he would "love" to do it. He further assured Bounds of the many benefits that would result. Bounds, however, was kept in the dark about who the target was or when it would take place.

That afternoon at the cab company Bounds again met with Sam Guzzino and defendant Guzzino. They were joined by defendant Robert Ciarrocchi, who turned out to be the "weapons man." They all got in Sam's car and drove to a rural area in Will County to determine if Bounds knew how to shoot, a basic qualification of the job. Ciarrocchi extracted a rifle from a golf club box,[7] adjusted the telescopic sight, and fitted a silencer to the end of the barrel. Ciarrocchi fired at a small sign and hit it. Sam complained that the rifle was too loud. Defendant Ciarrocchi conceded he needed to do a little more work on it. Bounds then fired at the sign and missed it. When they all inspected the target, they discovered that Ciarrocchi's shot, although right on the mark, merely dented the sign without penetrating it. Sam again com-

plained and defendant Ciarrocchi again conceded that the rifle needed more adjusting. He assured Sam that the rifle would be ready on time.

Returning from the unsuccessful target practice, they drove by the country club to look it over, not for golf, but for murder. Sam pointed to the eighth tee, but added that that location would require the use of a handgun, not the rifle. Another tee they examined would permit use of the rifle, Sam thought, from a concealed area across the street. Bounds wondered why the intended victim's golf game should be interrupted. Sam satisfied Bounds's curiosity by explaining that Will County, in which the country club was located, was a dumping ground for the mob because the county had no money to investigate mob assassinations. Defendant Ciarrocchi, his rifle now back in the golf club box, was dropped off elsewhere, but Bounds and the two Guzzino brothers drove back to the country club for another look. Sam Guzzino advised that he was going to Las Vegas for a few days, but in the meantime Bounds and defendant Guzzino were to work out the details. Sam made one more suggestion. Bounds, he said, might use a bicycle to escape after the shooting. Bounds was not very enthusiastic about that novel idea.

Nevertheless, the next day defendant Guzzino, driving his blue Eldorado Cadillac, picked up Bounds and told him they were going to buy him a bicycle. They drove to a residence where there was a sign nailed to a tree that announced "Bikes for Sale." Bounds approached the house and inquired about buying a bicycle. He was shown an old repainted ten-speed bicycle priced at $20. Bounds went back to the car and defendant Guzzino gave him $20 to pay for the bicycle. They then loaded this bicycle into the trunk, picked up Sam Guzzino at the cab company, and drove out to the eighth tee for a practice bicycle ride to some intended rendezvous point. Bounds tried to ride as fast as possible, but as the

---

**7.** For nongolfers, a golf club box, as distinguished from a golf club bag, is a rectangular box characteristically used for storing, shipping, and displaying golf clubs. It is designed to prevent damage to the shafts and heads of the clubs while in transit.

gears and chain kept slipping they gave up on that idea. Bounds retired the bike to his basement, no doubt to his great relief.

Bounds's marksmanship obviously left something to be desired so on the morning of July 20, defendant Guzzino, Ciarrocchi, and Bounds drove to a dump area in Will County for more practice. Ciarrocchi pulled a .45 caliber automatic pistol and a .357 magnum revolver from a brown paper sack. The dump "Keep Out" sign was designated as the target. Bounds was praised for emptying both guns into the sign, which he had accomplished from a range of about fifteen feet.

The next morning Ciarrocchi and Bounds again went back to the golf course to make a definite decision about the location for the shooting. Bounds strolled around the eighth tee area. Then, back in the car, they drove for some distance along a stream that flowed near the eighth green until they came to a bridge. This appeared to be a good rendezvous point for Ciarrocchi to retrieve Bounds if Bounds could get there somehow after the murder at the eighth tee. They then drove back to the eighth tee so Bounds could practice getting back to the rendezvous bridge by fast footwork. That worked better than the bicycle.

The next step in these painstaking preparations was to get Bounds properly outfitted. On July 22, defendant Guzzino took Bounds to a K–Mart store where he bought Bounds some dark green coveralls (no doubt so Bounds would not be so noticeable in the bushes at the eighth tee), a baseball cap, and a knapsack. Apparently the conspirators believed that Bounds for some reason would also need some special boots so defendant Guzzino agreed to acquire boots for Bounds. Instead, defendant Guzzino lent Bounds his boots even though they were much too big for Bounds. Bounds thought he needed a police scanner radio so that after the murder he could follow police activities as he headed for the rendezvous. When that idea had previously been discussed with Sam Guzzino, Sam had opposed it. Sam explained that a scanner was not needed because he would be in the foursome. After the murder, Sam explained, he would offer to call the police and ambulance, but would flounder around, and then when he did find a phone he would misdial. Therefore Bounds could be assured of plenty of time to get to the rendezvous without having to worry about the police.

Nevertheless, the conspirators later agreed to let Bounds purchase a scanner at their expense. Bounds went to Radio Shack, but could not find a suitable scanner so he purchased a citizens band (CB) radio. He carried it out to the car to show to defendant Guzzino, but Guzzino did not like the choice and sent Bounds back into the store. Bounds exchanged the radio for a more powerful CB radio. Defendant Guzzino and Bounds later gave the radio a field test, which it failed, so they took it back for a refund.

These careful preparations were nearing completion. Bounds was sent to a residence in Chicago Heights to pick up some videotapes to take to Sam Guzzino. Sam explained that they were taken at his mother's seventy-fifth birthday party. He exhibited them on a videocassette recorder so they could be viewed. Sam Guzzino froze the frame on a party scene and for the first time identified one of the partygoers, Alfred Pilotto, as "the guy we want hit." Bounds was not enthusiastic to learn who the victim was because, as he pointed out, Pilotto's brother was the Chicago Heights Chief of Police.

Sam Guzzino's response is important to this case. Sam said he knew that, but that Pilotto had to die. He further explained that Pilotto was seventy-one years old and that "he's got a case in Miami, and we're afraid he is going to spill some names." Sam told Bounds, "Don't worry about it, it's been blessed," which Bounds understood meant that the killing "was okay, it was approved of" by higher authority. Sam then went over some additional details with Bounds. He instructed Bounds that when Pilotto drove up to the tee in the golf cart he was to be "hit" as soon as he

stopped and put his left foot on the ground to get out of the cart. Sam cautioned, however, that "if he hears a twig crack in them bushes, he's going to be in his golf cart and taking off." Sam also warned Bounds that he had better come out of the bushes shooting because Pilotto had to die that day. Sam added that by the time he himself would arrive at the tee in his golf cart following behind Pilotto, it should already be over, and Bounds should be on his way. This was to happen the coming Saturday.

The next day, Friday, was the final dress rehearsal. Defendant Guzzino picked up Bounds, dropped him off near the eighth tee, where Bounds hid in the bushes. At the appointed time Sam Guzzino rode up in a golf cart accompanied by defendant Ciarrocchi. Sam got out of the cart and said loud enough for Bounds to hear, "Are you there?" Bounds responded. Sam endeavored to see him and finally did, remarking "that's great, that's beautiful." He instructed Bounds to continue the dress rehearsal by running to the rendezvous point so his run could be timed.

Saturday, the chosen day, arrived. Bounds shaved off his moustache and made a nylon stocking mask. Ciarrocchi picked him up at 2:20 a.m. They rode to Ciarrocchi's apartment. There Ciarrocchi loaded two pistols, wiping the guns and ammunition free of fingerprints. He also provided Bounds with a pair of gloves, which like Bounds's boots were also too big and made Ciarrocchi a little concerned about whether Bounds could pull the trigger. Sam Guzzino stopped by briefly to let them know that "everything is a go. They're supposed to start teeing off at 6:00 [sic] o'clock." Defendant Guzzino arrived with a police radio scanner he had borrowed from an employee at the cab company. All was now ready. Bounds put the scanner in the backpack he was wearing, and he and Ciarrocchi left about 8:00 a.m. because they had to be on the golf course by 8:30.

Bounds got into the bushes on time and soon saw a golf cart coming up to the tee. He had no trouble recognizing Pilotto.

Riding with Pilotto was Nicholas Fushi, whom Sam had instructed Bounds to be sure not to shoot as Fushi was Sam's friend. The foursome, including Sam Guzzino, was rounded out by Rudy Bamonti, who rode along in Sam's golf cart. All were members of the club and had played together regularly for five or six years. Pilotto got out of the cart, teed off, and walked back towards his golf cart while the others teed off. Bounds was behind schedule, because Sam and his partner had arrived and were already teeing off. Bounds heard Sam say "go ahead and shoot." Assuming Sam was talking to him and not just telling Sam's golfing partner to tee off, Bounds shot, hitting Pilotto in the shoulder. Bounds then stood up and walked out of the bushes. Pilotto fell down, held up his hands, and pleaded with Bounds not to shoot. Bounds explained in his testimony that because he was already committed, he shot three more times at Pilotto at close range. By that time Fushi had run the other way to hide behind a tree. Then Bounds turned to leave, but just missed shooting himself in the foot as his gun went off again accidentally. Bounds started running for the rendezvous but forgot to take along his knapsack and radio which were left behind in the weeds. He made much better time to the rendezvous than he had during the dress rehearsal, and arrived ahead of Ciarrocchi. Bamonti and Sam Guzzino used their golf towels on Pilotto's wounds, then loaded him in a golf cart. They drove the cart about a block to some condominiums to find a phone.

The next morning Bounds met both Guzzinos at the cab company. Bounds, who knew he had not lived up to expectations, inquired how Pilotto was. Sam replied that it looked like he was going to be okay, "but maybe it is good he didn't die anyway, because now the war is on." Bounds went about his cab driving business as usual.

Later, however, Sam Guzzino informed Bounds that he had received some feedback that there was suspicion that Bounds was the one who had attempted the assassina-

tion. Defendant Guzzino gave Bounds some money to go to Atlanta to see a friend of the Guzzinos. Bounds went to Atlanta, saw the Guzzinos' friend, and thereafter moved from place to place until November 30, 1981, when he finally turned himself in to the Chicago Crime Commission and the FBI. Bounds began cooperating. This resulted in some recorded conversations between Bounds and defendant Guzzino. The unsuccessful murder escapade was over.

At trial, Bounds admitted on cross-examination to the regular use of various unlawful drugs, including heroin, cocaine, and marijuana. He was revealed as an ex-felon, wife beater, and a paid witness in the government's witness protection program. The Guzzinos' friend whom Bounds saw in Atlanta described Bounds as a "crumbbum." Nonetheless, Bounds's tale of this bungled murder remained substantially intact despite inconsistencies regarding dates, times, and other details developed on cross-examination.

The government called a variety of other witnesses to reinforce supporting details. Pilotto, the intended murder victim, testified as an immunized witness.[8] He related that he had known both Guzzinos all their lives, but had not known Bounds, Sam's former son-in-law. He described his wounds. He said that he was shot in the forearm and elbow, shot in the leg and groin, shot in the collarbone and shoulder blade, and sustained other shots in the knuckle and the chest, but somehow survived. He confirmed that he had not testified at his own trial in Miami, the *Accardo* case. Pilotto, however, was not permitted to testify as to whether or not he had ever intended to testify in that trial. Ciarrocchi, who had no prior record, testified in his own defense, denied any involvement in the conspiracy, and offered a reason why Bounds had framed him. Another defense witness confirmed animosity between the two. Ciarrocchi denied that he had ever

used a silencer or tried to teach Bounds how to shoot.

The defense also offered the testimony of two attorneys who represented certain defendants in the *Accardo* case in Miami. They explained that the *Accardo* case had been declared a complex case early in July of 1981 and that therefore the Speedy Trial Act[9] guidelines were not applicable. The case, according to their testimony, was not actually expected to commence on July 27, 1981, the date originally set for trial. The purpose of this testimony was to try to show that the Pilotto shooting could not have been related to the *Accardo* case because there was in fact no rush for the murder to be committed July 25. There were several other defense witnesses but they presented nothing significant. The defendants also offered a newspaper article about the *Accardo* trial and the attempt on Pilotto. It was read to the jury to suggest that Bounds could have fabricated his story of the shooting prompted by that article.

## II. ANALYSIS

### A. Sufficiency of the Evidence to Establish Federal Jurisdiction

The first issue is whether Bounds's version of the attempted murder, which the jury believed, can be subsumed under federal law. The defendants maintain that the *Accardo* Miami indictment was totally unrelated to the attempt on Pilotto's life. Thus, they argue, the attempted murder is within the province of Illinois law and the federal court has no jurisdiction. The defendants in addition attack the credibility of Bounds. Although they concede that Bounds was in some way involved, the defendants argue, with very little to go on, that "most probably" Bounds was not the actual shooter and that his story was contrived.

■ We have closely scrutinized the conspiracy evidence in the record, as the defendants have strongly urged, and find it to be sufficient for the jury to relate the

---

8. Pilotto is now serving a twenty-year sentence imposed upon conviction in the *Accardo* case.

9. 18 U.S.C. §§ 3161–3174 (1982 & Supp. II 1984).

attempted murder to the *Accardo* Miami trial beyond a reasonable doubt. *See United States v. Papia,* 560 F.2d 827, 835 (7th Cir.1977); *United States v. Buschman,* 527 F.2d 1082, 1085 (7th Cir.1976). That determination admittedly depends to a large extent on Bounds's testimony about his conversation with Sam Guzzino. The most controversial and critical testimony was Bounds's assertion that Sam Guzzino had told him that Pilotto had to die because there was fear Pilotto would "spill some names" in the Miami case and that the murder had been "blessed." [10] According to the defendants, "[i]t is this single statement by a dead man, outside the presence of the defendants, testified to by a moral degenerate, convicted felon and chronic multiple drug user upon which federal jurisdiction is based." That is largely true, but we will not second-guess the jury's determination of Bounds's credibility. *See United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). The jury heard all about Bounds's unsavory character and heard his inconsistent testimony about some dates and other details. Nevertheless, his story remained substantially intact and the jury obviously chose to believe it. Bounds's testimony was sufficient to form a basis for the convictions of his accomplices, defendants Guzzino and Ciarrocchi. *See United States v. Velasquez,* 772 F.2d 1348, 1352 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986) (a conviction may properly be based on accomplice testimony).

The defendants further contend that there was no hurry to kill Pilotto, and thus the attempted murder had no relation to and could not have been intended to obstruct the *Accardo* trial. There is no dispute that Pilotto was a defendant in the *Accardo* case along with some other notorious figures and that the case was docketed to go to trial on Monday, July 27, 1981, after the Saturday, July 25 murder attempt. *Accardo* had, however, been declared a complex case, which would take it out of the time restraints of the Speedy Trial Act. Although it was docketed to begin on Monday, defendants argue, none of the attorneys expected it to begin then. It did not begin until April of the following year.

We can assume that the factual basis of that defense argument is true, but that does not change the relationship between the murder attempt and the *Accardo* case. If Pilotto was in fact a danger to the others in the *Accardo* trial it is possible that the others determined that Pilotto might as well be eliminated sooner rather than later, regardless of the time of trial, lest he bargain away some information in the meantime. It appears, in any event, that Sam Guzzino, while he was arranging the murder, believed that speed was of the essence regarding the *Accardo* case, and said so. Perhaps he was just not aware of the complexities of the Speedy Trial Act, or knew only that it was still set to begin on Monday and that the trial judge would have to be persuaded to continue it. Perhaps he did not care about those minor details. We know only that Sam Guzzino said there was fear about Pilotto and the *Accardo* case and proceeded to direct the actions to eliminate the danger.

Nor is it important whether or not Pilotto actually testified in *Accardo,* or ever intended to testify and thereby possibly endanger others. The evidence of Pilotto's actual intent about testifying was correctly not admitted by the trial judge. What is important, is what the concerns, thoughts, and fears of the coconspirators may have been about Pilotto's possible actions, even if those concerns were totally mistaken. The evidence suggests that they were taking no chances with Pilotto and the *Accardo* case. We find that the evidence, re-

---

10. The defendants have not argued that the district court mistakenly admitted Sam Guzzino's statement. Coconspirator declarations are admissible if the judge finds from a preponderance of the independent evidence that a conspiracy existed and that the accused were members of it. *United States v. Dalzotto,* 603 F.2d 642, 644 (7th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979).

gardless of how it is weighed, when viewed in the light most favorable to the government, could have persuaded a rational trier of fact beyond a reasonable doubt of the nexus between the attempted murder and the *Accardo* trial. *See United States v. Howard*, 774 F.2d 838, 841 (7th Cir.1985); *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984).

Sensing that we might view the evidence as sufficient, defendants contend that even if the evidence may be considered sufficient, it does not have adequate probative value to establish federal jurisdiction. The defendants argue that "[i]f Sam Guzzino had wanted Pilotto killed for other reasons —paranoia, a private feud, desire to move up in the 'mob,'—he may well have made that statement to give Bounds a feeling of confidence that it had, indeed[,] been blessed." That is a jury argument, which apparently did not impress the jury any more than it does us.

## B. *Sufficiency of the Evidence of Knowledge and Intent*

■ The defendants claim that the evidence is insufficient to sustain their convictions under Counts I and II because there is no direct evidence that the defendants knew of the *Accardo* trial or evidence to show that the defendants' intent was to prevent Pilotto from attending the *Accardo* trial.[11] Defendants cite *United States v. Guest*, 383 U.S. 745, 760, 86 S.Ct. 1170, 1179, 16 L.Ed.2d 239 (1966), for its holding that in a criminal conspiracy prosecution under 18 U.S.C. § 241, the government must show a specific intent to interfere with a protected federal right. The government has no quarrel with that specific intent requirement, or the application of the specific intent requirement in a substantial obstruction of justice prosecution

under 18 U.S.C. § 1503. To prove a violation of section 1503, the government must show that each defendant knew of the pending judicial proceeding and specifically intended to impede its administration. *See United States v. Ardito*, 782 F.2d 358, 361 (2d Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986).

It is difficult to find in this record direct evidence of the requisite knowledge and intent of the defendants. Direct evidence, however, although it may be considered more reliable, is by no means the only evidence from which a jury may find the necessary knowledge and intent. *United States v. Cogwell*, 486 F.2d 823, 828 (7th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974). It has long been established that "the verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it."[12] *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The "substantial evidence" necessary to prove a criminal conspiracy need not be proved by direct evidence as the common conspiratorial purpose and plan may be inferred from "a 'development and a collocation of circumstances.'" *Id.* (quoting *United States v. Manton*, 107 F.2d 834, 839 (2d Cir.1939)). As we noted in *United States v. Zuideveld*, 316 F.2d 873, 878 (7th Cir.1963), *cert. denied*, 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964), it is indeed a "rare case" where there is direct evidence to show the requisite knowledge and intent of coconspirators.

■ We recognize that an appellate court must exercise caution in reviewing a verdict based on circumstantial evidence. The verdict must not rest "solely on the piling of inference upon inference"; but neither should we view each bit of evidence

---

11. The defendants concede that the government need not prove that the defendants knew that a *federal* judicial proceeding was involved, but must prove only that the defendants knew of some judicial proceeding. *United States v. Ardito*, 782 F.2d 358, 360–62 (2d Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 2281, 90 L.Ed.2d 723

(1986). That concession makes little difference because the evidence in this case concerns only the federal *Accardo* trial.

12. The defendants have not claimed that the jury was not properly instructed on that issue to help it consider the evidence.

in isolation. *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). In *Redwine,* we held that as a practical matter it is necessary for a reviewing court to " 'use its experience with people and events [in determining] that the evidence correctly points to guilt [to guard] against the possibility' " of mistakenly affirming a guilty verdict based only on an " 'innocent or ambiguous inference.' " *Id.* (quoting *United States v. Kwitek,* 467 F.2d 1222, 1226 (7th Cir.), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972)).

■ Juries must also use experience and are entitled to use ordinary common sense in determining whether the evidence proves guilt beyond a reasonable doubt. *United States v. Perry,* 747 F.2d 1165, 1169 (7th Cir.1984). Common sense is no substitute for evidence, but common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence. Knowledge and specific intent are as susceptible of proof in that manner as is any other criminal requisite. That must be so lest conspirators be permitted to avoid the consequences of their illegal acts because of a factfinder's artificial and unrealistic view of real life.

■ We are satisfied that the jury could reasonably conclude that these defendants knew when they contributed to this murderous enterprise that Pilotto was to be killed to prevent him from testifying in the *Accardo* case. Defendants concede, as they must, that this murder attempt occurred, as inefficient as it was. The evidence clearly reveals that both defendants were crucially involved in the planning, training, supplying, rehearsing, and staging of the scheme, and in Bounds's escape after it failed. Even the later recorded conversations between Bounds and defendant Guzzino affirm defendant Guzzino's deep involvement.

There was a time schedule, which the participants considered absolute. The murder had to take place Saturday. The *Accardo* trial was to begin on Monday. Defendant Guzzino and Sam Guzzino were brothers working together, defendant Guzzino's only regret being that he himself was too fat to do what Bounds was privileged to do. The evidence strongly suggests that defendant Guzzino was not kept in the dark about what was going on, but fully knew what and why. Bounds was informed by Sam Guzzino that the hit had to be done to be sure that Pilotto did not talk in the *Accardo* trial. It is fanciful and totally unrealistic to think that the two defendants, one Sam's brother, who were both instrumental in the attempt and to whom Sam left the planning, even the decision about which tee to use for the hit, were not as well informed as was Bounds. The defendants would have us believe that Bounds, an unreliable drug addict among other things and the former son-in-law of Sam Guzzino, was better informed than either of them. Ciarrocchi had the guns and did his best to teach Bounds how to use them. Both defendants were in the car with Sam and Bounds when they drove out to look at the golf course. The golf course would be used, Sam explained, because it was a dumping ground for the "mob." There is no doubt that the affair had been "blessed" as Sam said, and all were satisfied. Sam's after-the-fact comment that "maybe it is good [that Pilotto] didn't die anyway, because now the war is on" is not explained. Defendants strain to make something out of this statement to show that the government relationship theory is wrong, but its ambiguity renders it worthless for any purpose. It could be argued simply that Sam Guzzino's golfing partner, Pilotto, got the message without being killed in the process.

All of the above circumstances could lead a jury exercising ordinary common sense to infer that both defendants knew that the purpose of the planned murder was to prevent Pilotto from testifying in the *Accardo* case.

### C. *Evidentiary Rulings*

The defendants argue that the trial judge erred in certain rulings and that the errors

were so restrictive as to deny them a fair trial.[13]

█ Defendants first contend that the court erred in sustaining a government objection to a question put by defense counsel to Pilotto. During cross-examination of Pilotto, defense counsel attempted to inquire if Pilotto had ever intended to testify at the *Accardo* trial. The government's objection, as we have already indicated, was properly sustained. The relevant issue was what the conspirators believed regarding Pilotto's possible cooperation with the government, not what Pilotto's intent to cooperate may actually have been. Just because the anticipated denial from Pilotto as to his actual intentions to cooperate might have been of some use in diverting the jury from the pertinent issue does not make that testimony relevant and admissible. Pilotto was in his seventies and faced a possible prison sentence if convicted in *Accardo*. Apparently the conspirators considered him a possible risk to others. In their profession that is enough.

█ The defendants also argue that the trial judge erred in refusing to permit a former assistant United States attorney who represented a defendant in the *Accardo* trial to professionally speculate whether any lawyer familiar with the *Accardo* case actually would have expected the case to go to trial on Monday, July 29, 1981. The government objection was properly sustained. The relevant issue is not what a lawyer would think, but what the defendants understood regarding when the *Accardo* trial would begin.

█ Even if the defense claims of error regarding the above two restrictions on testimony were valid, which they are not, they would have been harmless beyond a reasonable doubt. In each instance, the essential content of the expected but repressed answers were elicited through other testimony. The jury could have deduced Pilotto's intentions despite the limited restriction on Pilotto's testimony. Pilotto in-

formed the jury that he had never been approached by federal agents regarding his possible cooperation, that he had not talked to federal agents between the time of his arraignment on June 19, 1981, and his shooting, and that in fact he did not testify during the *Accardo* trial. Pilotto was permitted on cross-examination to say all that could be said when he further testified that it had never entered his mind to become a government witness. Similarly, the jury was fully informed by the *Accardo* attorney-witnesses for the defense as well as by the government case agent in *Accardo* that based on their experience the trial was not expected to begin as scheduled. That evidence was adequate to support the defense argument that the shooting was not related by any time rush to *Accardo*.

█ The defendants next allege as error the district court's refusal to allow defense counsel to question a former United States attorney for his opinion whether "defendants generally are very concerned lest anything happen to somebody during the course of the proceedings." That line of questioning was properly terminated by the trial judge. The trial judge likely did the defense a favor. If the judge had allowed the testimony, government cross-examination and other rebuttal evidence could have demonstrated, as is well known, that criminal defendants are not always reluctant to silence a potentially adverse witness by violent means. *See, e.g., United States v. Walker,* 710 F.2d 1062, 1064–65 (5th Cir. 1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984); *United States v. Bufalino,* 683 F.2d 639, 640–41 (2d Cir. 1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983); *United States v. Thevis,* 665 F.2d 616, 623–24, 648 (5th Cir.1982); *United States v. Smith,* 623 F.2d 627, 628–29 (9th Cir.1980).

█ The last defense claim is that the court erred in not letting an old and close friend of Sam Guzzino's, Peter Guidotti,

13. Defendants explain that no offers of proof were made because there had been a previous trial which had resulted in a mistrial. Defend-

ants say they relied upon the former partial trial since the trial judge was already familiar with the evidence and its purpose.

answer on cross-examination whether there was any reason why Sam Guzzino would have wanted Pilotto shot. Apparently, defense counsel anticipated that Guidotti would say he knew of no reason for Sam to kill Pilotto. The issue here depends on an interpretation of Federal Rule of Evidence 701, which limits the admissibility of lay opinion.[14] The government argues that courts in applying Rule 701 "have commonly barred testimony concerning a witness' impressions regarding a third person's thoughts and motivations."[15] This court, however, in *Bohannon v. Pegelow*, 652 F.2d 729 (7th Cir.1981), analyzed Rule 701 and concluded that lay opinion testimony as to the mental state of another is indeed competent under that rule. *Id.* at 731–32. Such testimony is therefore neither conclusively nor presumptively inadmissible, as the government appears to argue. In determining whether the testimony should be admitted, the trial judge should employ the criteria set forth in Rule 701. The testimony must be within the personal knowledge of the witness and " 'helpful to a clear understanding of [the witness's] testimony or the determination of a fact in issue.' " *Id.* at 732 (quoting Fed.R.Evid. 701). Ultimately, "the decision as to admissibility is within the sound discretion of the trial judge and the issues involved are peculiarly suited to his determination." *Id.* Thus to justify reversal, a trial judge's decision must be a "clear abuse of discretion." *Id.*

In *Bohannon*, the trial judge admitted the testimony of a lay witness who suggested that a certain arrest was motivated by racial prejudice. We rejected the argument that the witness' opinion was not within her personal knowledge, because she had observed the arrest. *Id.* Employing the foregoing analysis, we held that the witness' testimony was "technically admissible" and that the appellant had not shown a clear abuse of discretion by the trial judge in admitting the testimony. *Id.* at 733.

In the present case we likewise find no clear abuse of discretion. The trial judge could have determined that Guidotti's response that he knew of no reason why Sam Guzzino would have wanted Pilotto shot would not be helpful. The statement would not have revealed the facts causing Guidotti to reach that conclusion, and thus the jury would have had no basis on which to have made an independent judgment. In addition, this narrow restriction imposed on the particular inquiry could have little significance. Guidotti's lack of knowledge regarding reasons why Sam Guzzino might want to have Pilotto killed could mean very little.

As with the other evidentiary issues raised contesting restrictions on testimony, there was already evidence in the record to permit the defendants to argue their position. Sam Guzzino and Pilotto were old friends and golfing companions, and Pilotto had even attended Sam's mother's birthday party. There could be, at least theoretically, no conceivable reason why Sam wanted Pilotto murdered. The defense was not crippled by this correct evidentiary ruling, but even if it was error, there was adequate related evidence admitted to render it harmless.

## III. CONCLUSION

We find sufficient evidence to establish federal jurisdiction and the defendants'

---

**14.** Fed.R.Evid. 701 provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

**15.** To support its argument, the government cites *United States v. Ness*, 665 F.2d 248, 249–50 (8th Cir.1981) (bank employees precluded from offering opinions on whether coworker intend-ed to defraud the bank); *United States v. Cox*, 633 F.2d 871, 875–76 (9th Cir.1980), *cert. denied*, 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981) (error to allow witness to offer impressions regarding what the accused meant by accused's statements and contemporaneous conduct); *United States v. Jackson*, 569 F.2d 1003, 1011 n. 17 (7th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978) (district court properly refused to permit wife to give reasons for husband's depression).

knowledge and intent. In addition, we find no reversible evidentiary errors in the trial of this case. The judgments as to both defendants are therefore

AFFIRMED.