NATIONAL PAINT & COATINGS ASSOCIATION; Rust–Oleum Corporation, an Illinois corporation; the Sherwin–Williams Company, an Ohio corporation; Ace Hardware Corporation, a Delaware corporation; Tru–Test Manufac-

turing Company, a Delaware corporation; FMA Inc., d/b/a Jim's Ace Hardware, an Illinois corporation; W.C. Schauer Hardware Center, Inc., an Illinois corporation; Smiley Ace Hardware, Inc., an Illinois corporation, Plaintiffs,

v.

CITY OF CHICAGO, an Illinois municipal corporation, Defendant.

No. 92 C 4023.

United States District Court, N.D. Illinois, E.D.

Sept. 23, 1993.

_____

10. New York law is similar. See CPLR 7502(b) & 7503(b).

Steven P. Handler, Harvey M. Sheldon, Bruce H. Weitzman, Paul Andre Katz, Edward C. Stewart, Victoria Lynn Petrow, McDermott, Will & Emery, P.C., Chicago, IL, for plaintiffs except Sherwin–Williams Co.

Thomas G. Dent, Jeryl L. Olson, Peter C. Woodford, Therese G. Pinter, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Sherwin–Williams Co.

Susan R. Lichtenstein, Anita K. Modak–Truran, Ronald D. Jolly, Nancie M. Campbell, Gail A. Niemann, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for city of Chicago, IL.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Presently before the court are (1) defendant City of Chicago's motion to strike tentatively admitted evidence, (2) plaintiffs' motion to strike tentatively admitted evidence, and (3) plaintiffs' motion to supplement the record. As explained below, we deny the City's motion to strike, grant in part and deny in part plaintiffs' motion to strike, and grant plaintiffs' motion to supplement the record.

### I. The City's Motion to Strike

To expedite the bench trial which commenced on July 15, 1993 and, after six days of testimony, concluded on August 2, 1993, the court ordered the parties to submit objections to certain trial exhibits and testimo-

ny in the form of post-trial motions to strike. In accordance with our ruling, the City of Chicago now moves to strike: (1) the written cross-examination of Robert Angone; (2) Plaintiffs' Trial Exhibit 161, submitted along with the written cross-examination of Robert O'Connor; (3) all references to "Wayco Hardware, Inc."; (4) Plaintiffs' Trial Exhibits 5A–5B, 6A–B, 7A–C, and 8A–B; (5) Plaintiffs' Trial Exhibit 9; (6) Plaintiffs' Trial Exhibit 36; and (7) Plaintiffs' Trial Exhibit 77.

### A. Written Cross–Examination of Robert Angone

■ The gravamen of the City's objection to the submission of excerpts from Robert Angone's deposition (Plaintiffs' Trial Exhibit 157) is that those excerpts are almost entirely redundant to those matters addressed in Angone's ninety minute, oral cross-examination (R694–745). The City protests that "[p]laintiffs are not entitled to a second bite of the apple as to any of [the topics covered in oral cross-examination]."

While we agree with the City that redundant cross-examination has no place in the record, it is equally apparent that the written submission in question cannot be labelled as such. Although plaintiffs may have touched on the same general subject matters in both the oral and written cross-examination of Angone, the specific lines of questioning were complimentary rather than redundant. Angone was one of the City's most important witnesses, and the written submission furthers plaintiffs' attempt to permissibly impeach the witness. Additionally, it is important to note that the procedure invoked by the court of submitting cross-examination in writing to conserve precious trial time was suggested initially by the City. R124. Plaintiffs reluctantly acquiesced, giving up the right to thoroughly confront the City's witnesses in person. As such, we can discern no prejudice to the City in allowing Plaintiffs' Trial Exhibit 157 in its entirety.

### B. Plaintiffs' Trial Exhibit 161

The City now objects to the introduction of Plaintiffs' Trial Exhibit 161 because it is hearsay and no foundation has been established. In apparent agreement, plaintiffs have withdrawn the exhibit, leaving the City's objection moot.

### C. References to "Wayco Hardware, Inc."

The City moves to strike any reference to the hardware store owned by "Wayco Hardware, Inc." In support, the City merely states: "Neither Wayco Hardware Inc. nor its sole shareholder, Mr. Schauer, is a party to this case. Mr. Schauer's testimony regarding that company is therefore irrelevant."

■ Contrary to the City's suggestion, plaintiffs need not confine its proof respecting the negative economic impact of the ordinances in question to the reverberations felt by the named plaintiffs. To be sure, in assessing the constitutionality of the ordinances under the commerce clause, the court's focus rests, at least in part, on the burdens imposed on interstate commerce as a whole, as opposed to plaintiffs' interstate commerce. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128, 98 S.Ct. 2207, 2215, 57 L.Ed.2d 91 (1978) ("the [Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations"). As such, evidence of the impact of the ordinances on entities such as "Wayco Hardware, Inc." are relevant, and will be admitted subject only to the restrictions of Fed.R.Evid. 403. In that the probative value of Wayne Schauer's testimony concerning Wayco Hardware, Inc. outweighs any prejudicial effect, we deny the City's motion to strike all references to "Wayco Hardware, Inc."

### D. Plaintiffs' Trial Exhibits 5A–5B, 6A–B, 7A–C, and 8A–B

■ Plaintiffs' Trial Exhibits 5A–5B, 6A–B, 7A–C, and 8A–B are examples of spray painted and brush painted items. The City objects to the introduction of these exhibits on the ground of relevancy. Specifically, citing *Exxon Corp. v. Governor of Maryland*, 437 U.S. at 128, 98 S.Ct. at 2215, the City contends that the potential harm to the consuming public "relates to the wisdom of the statute, not its burden on commerce."

In *Exxon*, the Court confronted a statute (1) prohibiting a producer or refiner of petroleum products from operating any retail ser-

vice station within the State of Maryland, and (2) requiring such producers or refiners to extend all "voluntary allowances" uniformly to all service stations it supplies. *Id.* at 119–120, 98 S.Ct. at 2207. Exxon contended that, regardless of whether the State had interfered with the movement of goods in interstate commerce, the statute interfered "with the natural functioning of the interstate market either through prohibition or through burdensome regulation ... [which will operate to] weaken[ ] the independent refiners." *Id.* at 127, 98 S.Ct. at 2214–15. In rejecting this argument, the Court stated: "It may be true that the consuming public will be injured by the loss of high-volume, low-priced stations operated by independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce." *Id.* at 128, 98 S.Ct. at 2215.

Unlike the plaintiffs in *Exxon,* the plaintiffs in the instant case do not contend that the exhibits in question are relevant regardless of whether the local governing body has interfered with the movement of goods in interstate commerce. Instead, plaintiffs contend that these exhibits demonstrate precisely why approximately 40% of consumers will abandon tasks they would otherwise perform with spray paint. In light of this link between the harm to the consuming public and the movement (or lack of movement) of goods in interstate commerce, we find that Plaintiffs' Trial Exhibits 5A–5B, 6A–B, 7A–C, and 8A–B are relevant and may be admitted into evidence.

### E. Plaintiffs' Trial Exhibit 9

The City objects to a portion of Plaintiffs' Trial Exhibit 9, consisting of John Skorburg's calculation of the economic impact in the City of Chicago of the ordinances in question. Specifically, the City contends that all analysis relating to "indirect" losses, job loss and sales tax loss should be stricken as "[t]hese matters cannot be calculated to a reasonable degree of certainty, nor were the calculations made according to a method accepted in the economic community."

Notably, the City does not contend that the above described losses are irrelevant to the current inquiry. Indeed, loss peripheral sales are a direct indication of the ordi-

nances' impact on the movement of goods in interstate commerce. Similarly, lost jobs and lost sales tax, while an indirect measure, nonetheless evince an impact on interstate commerce. That these figures are difficult to calculate precisely bears on the weight afforded the evidence, not its admissibility. Further, contrary to the City's vague assertion, the methodology underlying Skorburg's calculations does not render the exhibit inadmissible. Accordingly, we deny the City's motion to strike Plaintiffs' Trial Exhibit 9.

### F. Plaintiffs' Trial Exhibit 36

Plaintiffs' Trial Exhibit 36 is a letter from Commander Dart of the Public Transportation Section of the Chicago Police Department to Jay Beswick. The City objects to the introduction of this exhibit, contending that it is not probative to any material issue in the case. This exhibit, however, is relevant to rebut the City's contention that, as evinced by City expenditures, it has undertaken significant efforts to address the graffiti problem faced by the Chicago Transit Authority. As such, we deny the City's motion to strike Plaintiffs' Trial Exhibit 36.

### G. Plaintiffs' Trial Exhibit 77

Subject to the admission of Plaintiffs' Trial Exhibit 93, an affidavit of Roman Pasicnyk revising his calculations, the City has withdrawn its objection to Plaintiffs' Trial Exhibit 77.

### II. Plaintiffs' Motion to Strike

Plaintiffs now move to strike the following evidence tentatively admitted at trial: (1) Professor Wesley Skogan's expert testimony respecting the deterrent effect of the challenged ordinances; (2) the lay opinions of Joan Hardy, Genevieve Brown, Gary Walker, Robert Mason and Constance Mortell concerning the expected efficacy of the challenged ordinances; (3) the testimony of Lt. John Romero; (4) paragraphs 15–28 of Defendant's Trial Exhibit 72; (5) paragraphs 21–25 of Defendant's Trial Exhibit 88; (6) all references in the testimony of Michael Kennelly and related exhibits concerning lost profits as a measure of the challenged ordinances' impact on interstate commerce.

## A. Professor Wesley Skogan's Expert Testimony Regarding The Expected Efficacy of the Challenged Ordinances

On April 9, 1993, the City of Chicago filed a motion to limit plaintiffs to only one expert witness per subject area. Pursuant to Rule 5 of the General Rules of the United States District Court for the Northern District of Illinois, on April 29, 1993, we granted the City's motion, explicitly noting that "Rule 5 is a 'two-way street' and, accordingly, the City is likewise limited to one expert on each subject matter."

In the final pretrial order filed with this court on June 22, 1993, the City designated two expert witnesses to testify concerning the anticipated deterrent effect of the challenged ordinances. Specifically, the City represented that Dr. Charles Cicchetti would testify, based on his theory of travel-cost economics, as to "how increasing the costs of procuring the materials used to commit graffiti vandalism through the ordinances is a reasonable means of decreasing the amount of graffiti vandalism." Dr. Louis Wilde was to testify "on the subject of the economics-of-crime, with a focus on deterrence theory and its application to the City's anti-graffiti ordinances." More to the point, based on his economics-of-crime theory, Wilde was to testify "how through the ordinances, increasing the costs of engaging in graffiti vandalism and increasing the likelihood of apprehension of graffiti vandals are reasonable means of decreasing the amount of graffiti vandalism." Although both Wilde and Cicchetti testified about the anticipated deterrent effect of the challenged ordinances in broad terms, each approached their analysis from seemingly different economic theories, *i.e.*, travel-cost economics vs. economics of crime theory. As such, plaintiffs do not move to strike either Wilde or Cicchetti's testimony as violative of this court's order dated April 29, 1993.

■ In light of Wilde and Cicchetti's testimony, however, plaintiffs request the court to strike Professor Wesley Skogan's testimony concerning the likely deterrent effect of the challenged ordinances. *See* R550–53, 562–64. We agree with plaintiffs that Skogan's testimony on this subject matter is defective in two respects. First, it is a plain violation of our order permitting only one expert witness on each subject area for each party. While Skogan labelled his approach to deterrence as broader than a traditional economist, he nonetheless discussed deterrence in the same terms as Drs. Wilde and Cicchetti:

Q. Do you have an opinion based on a reasonable degree of certainty in your field whether a ban on the sale of spray paint and markers should reduce graffiti vandalism?

. . . .

A. On the City's ban? Well, I think when you think about the principles that I talked about that underlie our criminal law, which is—it is trying to structure costs so that they outweigh the benefits, that what you see here is an attempt through regulation—and that's why this is not just a criminal justice problem—it's an attempt through regulation to impose a set of costs.

The costs come from, on the one hand, controlling access to materials so that very handy and easy to use and very effective materials are more difficult to get. And that the alternative ways of getting them will involve time, will involve breaking up spontaneous action. You can't sort of spontaneously say, "Let's hop on the South Shore and go to Hammond and find some paint." It becomes much more difficult. So it breaks up the spontaneity that lies behind a lot of this kind of tagging behavior. And that it imposes the kind of inconvenience and lack of knowledge about where to go and what's out there.

So that, on the one hand, you have now raised the costs and made it much more inconvenient, much more difficult, one the one hand, to secure materials. And you balance that against motivation, a benefit, if you will, which I think is not particularly strong. That is, it's flaunting authority, it's being—having a reputation among your friends. Again these are not ways you can make a living. These are not things that pay off in any concrete way.

And it should be possible, by structuring the costs appropriately, to make behaviors that are based on that kind of motivation

to—as we say, to extinguish those behaviors fairly readily.

R562–64. Without commenting on the weight his opinion deserves, Skogan's analysis is in every sense a traditional cost-benefit analysis in the same manner as that of Drs. Wilde and Cicchetti. Second, Skogan's testimony on this subject matter transcends the area in which he was designated an expert. In the final pretrial order, the City stated only that "Professor Skogan will testify to the magnitude of the graffiti vandalism problem in Chicago and how graffiti vandalism contributes to the overall decline of Chicago neighborhoods." Unlike its designations regarding Drs. Wilde and Cicchetti, the City's representation regarding Skogan's testimony did not inform plaintiffs that the City intended to elicit from Skogan his opinion regarding the deterrent effect of the challenged ordinances. The prejudice to plaintiffs in terms of trial preparation is apparent. Accordingly, for the above reasons, we grant plaintiffs' motion to strike Professor Skogan's testimony concerning the anticipated efficacy of the challenged ordinances.

**B. Lay Opinions Concerning The Expected Efficacy of the Challenged Ordinances**

■ Joan Hardy (Executive Secretary of the East Side Chamber of Commerce), Genevieve Brown (Director of the Mayor's Office of Inquiry and Information), Gary Walker (Program Director of the West Central Graffiti Removal for the Community Affiliation for Repairs for the Elderly and Disabled), Robert Mason (Executive Director of the South East Chicago Commission) and Constance Mortell (External Affairs Officer for the Chicago Transit Authority) each testified, either orally or in writing, that the challenged ordinances should result in a decrease in graffiti in Chicago. Unlike Drs. Wilde and Cicchetti, none of these witnesses have been designated or qualified as expert witnesses respecting the likely deterrent effect of the challenged ordinances. As such, plaintiffs move to strike the testimony of these witnesses on the subject matter of the ordinances expected efficacy as improper lay opinions under Fed.R.Evid. 701.[1]

It is evident that the five witnesses listed above have had a differing degree of contact with graffiti and graffiti writers, rendering some of their opinions more rationally based on their own perception. Regardless of these witnesses' respective contact with graffiti and graffiti writers, however, we will strike each of their proffered testimony regarding the anticipated deterrent effect of the challenged ordinances in that such lay opinions are not helpful to either a clear understanding of their testimony nor to the determination of a fact in issue. Unlike the typical lay opinion allowed into evidence, *i.e.*, as to the identity of a person depicted in a surveillance photograph, *see United States v. Stormer*, 938 F.2d 759, 761–62 (7th Cir.1991), rendering an opinion as to the anticipated deterrent effect of the challenged ordinances entails much more than drawing conclusions from physical manifestations. As plaintiffs' experts, Drs. Wilde and Cicchetti, testified, such a determination necessarily requires an analysis of the cost imposed by the ordinances and the benefits associated with the activity sought to be curtailed. While lay testimony as to graffiti writers' state of mind is neither conclusively nor presumptively inadmissible, *see United States v. Guzzino*, 810 F.2d 687, 699 (7th Cir.), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1957, 95 L.Ed.2d 529 (1982), the addition of such cost-benefit factors associated with a reliable evaluation of the likely deterrent effect of the challenged ordinances compels the court to strike all lay testimony on the matter. That such testimony would not aid this court in the determination of the merits of this suit is especially evident in light of the extensive expert testimony concerning the expected efficacy of the ordinances in question. Accordingly, we strike the following testimony: (1) the opinion testimony in paragraphs 15–17 of Joan Hardy's affidavit, Defendant's Trial Exhibit 84; (2) the opinion testimony in paragraphs 31–32 of

---

1. Rule 701 of the Federal Rule of Evidence provides:

   If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Genevieve Brown's Affidavit, Defendant's Trial Exhibit 76; (3) the opinion testimony in paragraphs 16–18 of Gary Walker's affidavit, Defendant's Trial Exhibit 79; (4) the opinion testimony in paragraphs 12–14 of Robert Mason's affidavit, Defendant's Trial Exhibit 85; and (5) the opinion testimony in paragraph 14 of Constance Mortell's affidavit, Defendant's Trial Exhibit 70.

### C. The Testimony of Lt. John Romero

Plaintiffs move to strike the entire testimony of Lt. John Romero, contending that (a) to the extent that his testimony related to "the relationship between the [challenged] ordinances and graffiti vandalism [in Chicago]," it is duplicative of Lt. Angone's and should be stricken pursuant to our order dated April 29, 1993, and (b) to the extent that his testimony related to his experiences with graffiti in New York City, it is irrelevant. We disagree with both contentions.

First, that Romero approaches the problem of graffiti vandalism from the perspective of his experiences in New York distinguishes his testimony from that of Lt. Robert Angone, taking it from the province of our order of April 29, 1993. Second, while the graffiti problems faced in New York may differ significantly from that in Chicago, such distinction bears on the weight to be afforded Romero's testimony and not on its admissibility. Consequently, we deny plaintiffs' motion to strike the testimony of Lt. Romero.

### D. Paragraphs 15–28 of Defendant's Trial Exhibit 72

Defendant's Trial Exhibit 72 is the affidavit of George C. Haenisch, currently the General Manager of Bus System Maintenance at the Chicago Transit Authority. Plaintiffs' move to strike paragraphs 15–28 of that affidavit, which detail security measures attributable to graffiti and their respective cost, as inadmissible hearsay. Specifically, plaintiffs' protest that Haenisch did not prepare the cost figures himself, but relied on one or more of his subordinates. Haenisch, however, testified that he personally checked the accuracy of the figures, R762, and the City has laid a proper foundation in paragraph 28 of his affidavit. Much like the sales figures presented by witness Scaminace yet gathered by other Sherwin-Williams employees, the testimony of George Haenisch is not hearsay. That Haenisch may have changed his testimony since his deposition, while certainly detracting from his credibility, does not alter this conclusion, and we deny plaintiffs' motion to strike paragraphs 15–28 of Haenisch's affidavit.

### E. Paragraphs 21–25 of Defendant's Trial Exhibit 88

Defendant's Trial Exhibit 88 is the affidavit of James Harney, Director of the Department of Facilities for the Chicago Board of Education. Plaintiffs move to strike paragraphs 21–25 of that affidavit, which detail the cost of labor and materials expended by the Chicago Public Schools to remove or paint over graffiti, as inadmissible hearsay. In these paragraphs, Harney states that, much like Mr. Scaminace of Sherwin-Williams, Mr. Caprel of Tru–Test Manufacturing, Mr. Daley of Ace Hardware Corporation, Mr. Barry of Rust–Oleum, and anyone else with responsibility for a large organization, he relies on the reports of subordinates in gathering information. Harney further states that he requested such reports regarding the cost associated with the removal of graffiti in the Chicago Public Schools and that he received and relied upon such reports. Those reports comprise Defendant's Trial Exhibit 20. They, like the cost figures proffered by Haenisch, are not hearsay, and we will strike neither paragraphs 21–25 of Harney's affidavit nor Defendant's Trial Exhibit 20.

### F. References Concerning Lost Profits as a Measure of the Challenged Ordinances' Impact on Interstate Commerce

As Magistrate Judge Ronald A. Guzmán has previously ruled in connection with this case, lost profits is an irrelevant measure regarding the impact of the challenged ordinances on interstate commerce. *National Paint & Coatings Ass'n v. City of Chicago*, No. 92–4023, slip op. at 2 (N.D.Ill. July 2, 1992). As the Supreme Court in *Exxon* recognized, the impact on interstate commerce is measured in terms of "movement of goods," or "sales." *See Exxon*, 437 U.S. at 127 & n. 16, 98 S.Ct. at 2214–15 & n. 16.

The reason is apparent, and was best articulated by Magistrate Judge Guzmán:

> What is relevant is the impact of the proposed ordinance on sales within the City. This is the measure of the ban's impact on interstate commerce. The possibility of somehow offsetting this burden by a new marketing strategy (such as raising prices) is irrelevant.... All sorts of different possible marketing strategies could be conceived by [the City] to show how the companies involved could overcome any loss of revenues. Such an analysis [, however,] would ... make the ultimate issue dependant upon the company one is dealing with. A company with alternative markets and a favorable price elasticity might not be able to prove "excessive burden" while another company, selling the same product but not so favorably positioned, might very well be able to show such since it lacks flexibility to make up its loss of profit in other ways. Thus, whether or not the ordinance[s] [are] prohibited because [they] impose[ ] an excessive burden on interstate commerce might vary depending on the complaining party. The issue, however, should be the impact of the legislation on interstate commerce, not the injury or damage suffered by any one party. The net damage suffered is not the correct measure of the ordinances' impact.

*National Paint & Coatings Ass'n,* slip op. at 2–3. Concluding that the proper measure of the ordinances' impact on interstate commerce is lost sales and not lost profits, we strike all references in the testimony of Michael Kennelly and related exhibits concerning anticipated lost profits attributable to the challenged ordinances.

### III. Motion to Supplement the Record

Plaintiffs request that the record in this case be supplemented with two articles published shortly before or after the close of evidence on August 2, 1993. The first appeared in the Chicago Sun Times on July 29, 1993, and is entitled "Off On the Wrong Track." The second appeared in the Chicago Tribune on August 4, 1993, and is entitled "Police Raid Graffiti Gangs Headquarters." These articles contain statements by Lt. Angone and Constance Mortell, representatives of the City of Chicago, and, contrary to the City's assertion, are not hearsay. Further, they are self-authenticating documents under Fed.R.Evid. 902(6) and, as such, evidence of authenticity is not a condition precedent to their admission. Finally, in that the City has not suggested that the quotes attributed to either Angone or Constance were inaccurate, we discern no prejudice to the City in admitting the articles without affording the City the opportunity to introduce responsive evidence. Accordingly, we grant plaintiffs' motion to supplement the record.

### IV. Conclusion

For the reasons set forth above, the City's motion to strike is denied, plaintiffs' motion to strike is granted in part and denied in part, and plaintiffs' motion to supplement the record is granted. It is so ordered.